## STATE OF CONNECTICUT *v.* EDWIN FALES SNELGROVE, JR.
## (SC 17467)

Rogers, C. J., and Palmer, Vertefeuille, Zarella and Schaller, Js.

---

Argued January 8—officially released September 16, 2008

*G. Douglas Nash*, special public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *David L. Zagaja*, senior assistant state's attorney, and, on the brief, *James E. Thomas*, former state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Edwin Fales Snelgrove, Jr., appeals directly to this court pursuant to General Statutes § 51-199 (b) (3)[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant claims on appeal that the trial court improperly: (1) admitted evidence of his prior misconduct; and (2) excluded a third party confession. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of September 21, 2001, between 7 and 8 p.m., the defendant arrived at Kenney's Restaurant (Kenney's) on Capitol Avenue in Hartford. The

---

[1] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

defendant was a regular customer at Kenney's. Approximately one hour later, the victim, Carmen Rodriguez, also a regular customer at Kenney's, arrived at the restaurant and went directly over to the defendant. The defendant and the victim spent the evening together and were observed playing pool, dancing, drinking, kissing and leaving the restaurant together around midnight.

When the victim failed to return home that night, her family became alarmed. Her daughter, Jacqueline Garcia, reported her missing to the Hartford police department the next morning. Family members also informed Kenney's employees that the victim was missing. The police went to Kenney's on several occasions in the weeks following the victim's disappearance and questioned employees about what had transpired on the evening of September 21, 2001. At some point, the defendant learned that the police had been asking questions about him in connection with their investigation into the victim's disappearance and he called Janet Rozman, a bartender at Kenney's, to ask her what she knew about the investigation. The defendant told Rozman that, after he and the victim had left the restaurant, he had dropped her off nearby. The defendant also told Rozman that he had been away in Rhode Island since that night.

Several weeks after September 21, 2001, the defendant returned to Kenney's for the first time since the victim's disappearance. Paula Figueroa, a bartender at Kenney's, telephoned the victim's family, who immediately went to the restaurant. Miguel Fraguada, the victim's common-law husband, confronted the defendant on the sidewalk as he came out a side door of Kenney's and asked him, "Where is my wife?" The defendant told Fraguada that, on the night of September 21, 2001, he had taken the victim to eat at a restaurant on the corner of Broad Street and New Britain Avenue in Hartford

and then had dropped her off at a gas station on Capitol Avenue. Fraguada responded, "That's a lie, you have her." The defendant then stated, "It's too late," and ran back into the restaurant.

At that point, Fraguada, Garcia, Hector Gomez, the victim's nephew, and Jeffrey Malave, a family friend, went into Kenney's. The defendant was offering money to various people in the restaurant to prevent Fraguada and the others from coming in. Malave indicated that they just wanted to talk to the defendant and, ultimately, the restaurant owner provided a table at which they all sat. Because Fraguada was very agitated and kept interrupting the conversation, Malave asked him to go outside. Malave then told the defendant that they knew that he was the last person with whom the victim had been seen. The defendant stated that the victim had been very drunk and he had offered her a ride home. After they got into his car, the victim asked the defendant for money and he then dropped her off at the gas station. When Malave indicated that the victim was Garcia's mother, the defendant looked at her and stated, "I'm sorry, that was your mom?" Malave asked the defendant to call the police if he had any additional information and the defendant said that he would do so.

On or about October 16, 2001, a man identifying himself as "Ned"[2] called Henry Garcia, a detective for the Hartford police department. Ned stated that Don Mancini, an employee of Kenney's, had told him that the police wanted to speak to anyone who had information about the victim. Ned agreed to come to the police station on October 18, 2001. When Ned failed to appear, Detective Garcia contacted Mancini, who told him the defendant's name and where he worked. Garcia then contacted the defendant's employer, who told him where the defendant lived.

---

[2] Ned is the defendant's nickname.

On October 17, 2001, the defendant was hospitalized after attempting to commit suicide by ingesting a combination of sleeping pills, beer and pesticide. In a note to his parents dated October 16, 2001, the defendant had stated that he believed that the Hartford police department suspected him of involvement in the victim's disappearance and that he did not want to "go through this . . . ."[3] Detective Garcia visited the defendant in the hospital and determined that he had the same voice as the person named Ned who had called him on October 16. The defendant told Garcia that he had dropped off the victim on Capitol Avenue after she asked him for money.

On January 6, 2002, the decomposed and partially skeletized body of a woman was discovered near a dirt road in Hopkinton, Rhode Island. The body had been bound with sixty feet of rope and was covered with eleven plastic bags that had been taped and stapled together. The body was clothed only in a pair of underwear. Jennifer Swartz, the deputy chief medical examiner in the office of the state medical examiner in Rhode Island, examined the body and concluded that the cause of death might have been suffocation or strangulation. She could not rule out a penetrating injury to the neck or chest. Swartz determined that the woman had died at least two months earlier, and she could not rule out September 21, 2001, as the date of death. The Rhode

---

[3] The note to the defendant's parents provided in relevant part: "Last, but not least, there is a missing persons case in Hartford. The Hartford Police Department will surely be in touch sooner or later. I am supposedly one of the last people to see [the victim], a Spanish girl, when I gave her a ride from Kenney's Restaurant in Hartford to the Shell Station two blocks down Capitol Avenue. This was a month ago. . . . This girl, reportedly, has not been seen since. I will not go through this, and I will not make you go through this. It's best to just end it now.

"I'm sorry to leave you and the rest of the family 'holding the bag,' trying your best to answer questions that you really don't know the answers to. I have no answers for the police."

Island state police notified police departments in Rhode Island and Connecticut of the discovery and the Hartford police department ultimately was able to identify the body as the victim.

During the subsequent investigation into the victim's death, the police searched the defendant's residence in Cromwell, which he shared with his parents, and seized several maps of eastern Connecticut and travel information about Rhode Island. The defendant, who was employed as a traveling salesman and kept detailed travel records, voluntarily provided the police with mileage records and gasoline receipts relating to his travels during the months before and after the victim's disappearance. Michael O'Shaughnessey, a forensic analyst, testified as an expert witness for the state that, after determining the average gas mileage of the defendant's car and comparing the defendant's mileage log with his gas purchase records, he had determined that, between September 21 and September 23, 2001, the defendant had purchased approximately five and one-half to six gallons of gasoline over the capacity of the car's gas tank unless the car had been driven approximately 160 miles more than the defendant had recorded in his mileage log for those dates. The round trip distance between the defendant's home and the location where the victim's body was found was approximately that distance.

In February, 2002, the defendant was arrested and incarcerated on unrelated charges of which he was ultimately acquitted. The defendant was charged with the victim's murder in October, 2003. Mark Pascual, who was the defendant's cellmate during a portion of his time in jail on the unrelated charges, testified at the defendant's trial in the present case.[4] Pascual testified

---

[4] Pascual was incarcerated on charges of capital felony in connection with a murder for hire scheme. He gave testimony at the defendant's trial as part of a plea deal under which he was allowed to plead guilty to lesser charges in his case.

that the defendant had told him that he had taken the victim to breakfast, driven her to a secluded area near the Berlin fairgrounds, choked her to death, wrapped her body in a plastic bag and a tarp, and disposed of her body in Rhode Island.

After trial, the jury found the defendant guilty of murder and the trial court rendered judgment accordingly. This appeal followed. The defendant claims that the trial court improperly: (1) admitted evidence related to the defendant's prior convictions in New Jersey of manslaughter and attempted murder; and (2) excluded testimony that a third party had confessed to the victim's murder. We conclude that the evidence of the defendant's prior misconduct was admissible to establish the defendant's propensity to assault women to satisfy his sexual proclivities. Accordingly, we need not determine whether the trial court abused its discretion in admitting the evidence for other purposes because any such impropriety necessarily was harmless. We further conclude that the trial court did not abuse its discretion in excluding the third party confession.

I

We first address the defendant's claim that the trial court improperly admitted evidence related to his prior convictions in New Jersey of manslaughter and attempted murder. The following additional facts and procedural history are relevant to our resolution of this claim. The state sought to introduce at trial several items of evidence pertaining to the defendant's prior convictions in New Jersey of the manslaughter death of Karen Osmun in 1983 and of the attempted murder of Mary Ellen Renard in 1987. The evidence included testimony by Dennis Watson, the chief of detectives in the prosecutor's office in Middlesex County, New Jersey, concerning the Osmun case; a letter written by the defendant to the sentencing judge in the Renard case

providing the details of the offenses against both Osmun and Renard and explaining that the defendant was driven by a sexual compulsion to render women helpless by strangling them or hitting them over the head and then to undress them and place them in sexual poses;[5] and excerpts from four letters written by the

[5] The letter to the sentencing judge, dated April 14, 1988, provided: "The purpose of this statement is to describe what happened in the aggravated manslaughter of Karen Osmun in Middlesex County on December 24, 1983 and the attempted murder of Mary Ellen Renard on August 2, 1987, in Bergen County, [New Jersey].

"Both incidents occurred because of a strong sexual arousement I have had since I was in grade school. For unknown reasons (I never thought it was a problem until the Middlesex County case) I get enormous pleasure from seeing a good-looking female become helpless. Whether it is seeing a pretty girl asleep in person or seeing a girl faint or get killed in a movie or TV show, I cannot even come close to describing the feelings I get. My heartbeat rate increases until I think my heart is in my mouth, I get slightly dizzy, my hands sweat, and there is an *enormous* sexual arousement. I can remember having these feelings about my teachers as early as second and third grade, but I somehow knew enough not to talk about them to anybody. Every time I see a girl I am attracted to, whether it is in person, TV, movies or photographs, instead of simply 'undressing her with my eyes,' as most men describe themselves doing, I always imagine strangling her or hitting her over the head, carrying her limp body onto a bed, undressing her and arranging her arms and legs in some kind of seductive pose. This is what is going through my mind *every time* I look at or talk to a female. For over twenty years now, this has constantly been reinforced in my mind, mentally rehearsing it dozens of times a day. I will go out of my way (stay home from a party, stay up all night for The Late Show) to see a movie like 'Psycho' (the shower scene), 'Frenzy,' 'No Way to Treat a Lady' (starring Rod Steiger), 'The Boston Strangler,' and most James Bond films (where at least one beautiful female spy is killed, usually). I sometimes wonder what it would be like to have an EKG machine monitoring my heart rate while I sit and watch some of these shows. When I am alone with a girl, this is what I am *always* thinking about. I even think about this—fantasize about it—when I am in bed with a girl, constantly telling myself, 'no, no!' Ninety-nine out of one hundred times, I am able to restrain myself, (although there *have* been a few very close calls). It is like two people inside of me, one wanting like anything to hit or strangle this girl I'm with, the other *knowing that it is wrong*, fighting to stay in control. Except for these incidents I'm in jail for, I always managed (sometimes it was very difficult) to control my feelings and my hands. This is why it was so shocking for my friends and coworkers when I got arrested and charged with these crimes—I *have* been with many different girls, from college and work, and I *am* very popular. Everyone

defendant to his friend George Recck, in which the

who knows me thought there *had* to be some kind of mistake, that I would never do such a thing. These feelings have never been a problem in any social setting (work, parties, etc.)—it is when I am *alone* with a girl that the heartbeat, the sexual arousement, and the dizziness become *OVER-WHELMING*! Until I actually killed a girl (December 1983), I never considered that this was a serious problem, as long as I was perceived as an intelligent, pleasant adult at college or work.

"What happened in Middlesex County is as follows: On Saturday night, December 23, 1983, I was at a Christmas party with friends from college (I had graduated from Cook College of Rutgers University in the spring of 1983). Karen Osmun, a girl I had dated, from June 1981 to August 1982, happened to be at the party. We had each driven to the party alone, each in our cars, and each did not know the other would be there. It would not have mattered if we had known ahead of time; we were still friendly since breaking off our relationship. (This is not what the Prosecution will say; the police believed from the beginning that this death was the result of a heartbroken boyfriend. It *is* true that Karen had ended our relationship fifteen months before her death, but I was over that; it had nothing to do with what happened in her apartment that night.) Karen and I were leaving the house at about the same time, but we were not actually 'leaving together.' We were parked close to each other, and I was driving right behind her all the way home, since we lived right around the corner from each other, in New Brunswick, (the Party was in Piscataway). I decided at the last minute to stop at her house instead of going home. She invited me in; she was not surprised to see me, because she knew it was my car behind her coming back from the party.

"When we got inside, we started kissing, and she had taken her shirt and bra off when my heart started racing and these scenes in my mind began to take over, as usual. We were rolling around on her bed, and at one point, we rolled a little too far, and we fell off the bed, with me on top of her, with my hands on either side of her face. I remember at this point not being able to breathe too well, and my hands just wrapped themselves around the bottom of her throat. It was like one continuous motion, with my hands just ending up on her throat as her feet were still coming off the edge of the bed. I remember thinking 'I'm actually doing it this time.' I can't describe the feeling I had as I felt her throat in my hands. I know this is sick, and I'm embarrassed and ashamed to be writing about it like this, but I can feel that adrenalin[e] racing through my heart, hands and legs just thinking about it. It is like a combination of an electric shock and having someone sneak up behind you and scaring the daylights out of you. It's so hard to describe these feelings . . . It is like I just ran up three flights of stairs. It is like I have just taken a whole bottle of pep pills, and something inside me wants even more, to make the heart, the dizziness, the shortness of breath to increase even *further*. Something inside me *likes these feelings*. (I've never taken illegal drugs).

defendant discussed the offenses and compared himself

"Anyway, I found out that strangling a girl in reality is not like in the movies. It is practically impossible to kill someone with your bare hands. You'd have to be a football player with huge hands to really be able to do it. I held Karen's throat, pressing down with my thumbs, for as long as I could, but she was still sputtering, her eyes closed, her tongue stuck out of her mouth, lying on the floor making terrible, animal-like noises. Looking down at her, naked from the waist up, I remember all those feelings that drove me to do this disappeared; she wasn't going to die, I remember thinking, she's going to wake up and call the police! At this point, I panicked. I went into the kitchen, found a steak knife, went back to Karen and stabbed her in the abdomen. I was so scared at this point, and she was just lying still, making those noises, I just wanted her to stay quiet. The feelings were completely gone. Blood and stabbing and yellow mucus coming out of her mouth were never part of my sexual fantasies. That ruined it for me.

"I was always the prime suspect in this homicide, but the police never had anything but circumstantial evidence, so they never were able to charge anybody. I felt terrible from then on. I tried to commit suicide the next day. I swallowed a whole package of sixteen sleeping pills and a bottle of iodine, but I didn't die. I couldn't eat or sleep for months. I promised myself I would never do anything like that again.

"You can see that these feelings are so strong that they get in the way of logic. The prosecutor, Fred Schwanwede, is probably going to tell the Judge that I am a cold-blooded, heartless killer. If I were a cold-blooded, heartless killer, would I have chosen a former girlfriend for a victim? Of course not! Karen just happened to be the unlucky girl to be with me when I lost control of these feelings. The fact that she was a former girlfriend had nothing to do with it, as you can see by the fact that I did the same exact thing to a lady I had just met on the night of August 1, 1987 (the Bergen County incident) . . .

"You would think that after actually killing someone, I would have tried to get professional help. But it was such a terrible experience; and I was so thankful to have not been arrested, that, even though I would *still* get those sexual and violent urges, I had convinced myself that I would never allow myself to lose control ever again.

"A very similar scenario occurred on the night of Saturday, August 1, 1987. I had met a lady named Mary-Ellen Renard at a bar, in Clifton, spent a few hours with her, and she invited me to follow her back to her apartment in Elmwood Park. Once in her apartment, pretty much the same thing happened. She had undone the top half of her dress and taken her bra off. She was laying on her back on the couch, and I was on top of her when I could not stop my hands from squeezing her throat as hard as I could.

"After a few seconds, she passed out, and I dragged her into her bedroom, half-naked. Again, you can see that these feelings completely took over, because if I was actually carrying out a pre-meditated, planned act, I wouldn't have allowed myself to be seen leaving with this lady from the bar we were

to Ted Bundy, a notorious serial killer. The defendant wrote the letters to Recck on June 20, 1988, August 1, 1988, August 25, 1988, and May 5, 1992, while the defendant was incarcerated in New Jersey.[6] The state argued that this evidence fell into the exception to the

in, and I probably would have brought a weapon into the bedroom with me.

"Unlike what happened in Middlesex County, this girl woke up and began fighting in the bedroom. I ran back into the living room and, again in a [panic], picked up a stupid little cheese knife from the coffee table. I ran back into the bedroom and stabbed her, remembering how that worked to quiet things down in 1983, but this time it did not work. All the furniture in her bedroom had been kicked over, she was screaming, and the phone was ringing (it was her landlady calling from downstairs). I tried to leave, but a key was required from the inside to open the front door, so I ran back up the stairs and jumped out the window. . . .

"Obviously, there is something inside of me that I cannot handle by myself. I kidded myself not once, but twice, that I did not need help. I do.

"At this point in my life, I hate myself. I had it made. I was popular. I was Senior Class Treasurer and President of the Honors Fraternity in college, I had a great job at Hewlett-Packard in Paramus, [New Jersey]. I cry every time I think of my parents. I feel very sorry for them, to have a son turn out the way I did, after having everything going for me. I feel very sorry for Mary-Ellen Renard. She was very nice; she did not deserve this awful experience. I feel *terrible* for Karen Osmun's family. I know I could never ever face them, or any of my friends from college.

"I've ruined my life. I hope I can get help to change my thinking towards women. I'm dying to know what causes this turmoil and andrenalin[e] and pounding and excitement inside of me. I still can't believe that I actually killed somebody. As if that were not enough, there is another tragedy, and I want to confirm this with the psychiatrist that is going to visit me: I was really doing well. I was very popular with everyone, I have no criminal record, and I was a likeable person (an Honors Student with a good family background) contributing to the community. In light of what I have done, this is going to sound ridiculous, and I hope the psychiatrist sees this: As long as I am not allowed to be alone with a female, I am not a threat to society. Friends will back me up on this point." (Emphasis in original.)

[6] The excerpt from the letter dated June 20, 1988, provided in relevant part: "'There was something I couldn't tell you or even my parents last winter when I was out on bail. This 'incident' last August was not the first time I lost control of myself with a girl. You'll never believe what I am about to tell you—I had actually gotten away with murder (it happened in December 1983) until this other thing happened last summer. I'm sorry—I hope you understand that I was doing everybody a favor and postponing a lot of pain by not telling you. Anyway, once everybody in New Jersey heard about this thing last year, I knew it was all over, since I was a main suspect of the

rule prohibiting the admission of prior misconduct evi-

1983 crime. Anyway, my lawyer did a great job, talked with prosecutors from both counties . . . . Sentencing, I think, is this coming week. Now I'm *sure* to be a big hit at the reunion. So make the magazines 'long-term' subscriptions." (Emphasis in original.)

The excerpt from the letter dated August 1, 1988, provided in relevant part: "Did you watch the Ted Bundy story ('Deliberate Stranger') on TV a couple of weeks ago?"

The excerpt from the letter dated August 25, 1988, provided in relevant part: "As for the saleability of my story, don't think in the *short* term. Wouldn't it be a great story when I pick up right where I left off after doing some significant time, with lots of great characters and anecdotes to offer?" (Emphasis in original.)

The excerpt from the letter dated May 5, 1992, provided: "Yes, I read one of the many books on Ted Bundy *and* saw the movie with Mark Harmon (who, I've always said, looks just like Lee Harvey Oswald). Ironically, not many similarities between him and me (yes, that *is* correct grammar; 'he and I' is *wrong* in that sentence. Amazing that I still care about grammar after living here for four years!) But I can state with some confidence that I know what he was feeling (sexual thrill). In fact, Bundy's way of going about it (his 'm.o.') is a textbook for what I *should have* done in order to avoid arrest. He *planned* his crimes! He would get out of work on a Friday afternoon with his car *packed* and drive 100 miles to another town, where he would just settle in at a bar until he met a girl. It was his *hobby*! *I* never (and this is why I got caught) allowed myself to actually sit down and *plan* something like this. Although I was always *thinking* about it, I never actually went out and drove around, trying to *find* a situation. Both of my crimes (manslaughter in December 1983 [and] attempted murder in August 1987) were *impromptu* acts, where, instead of being planned out, I had simply convinced myself that now was a good time. No planning at all beforehand. It was a miracle that I had gotten away (temporarily) with December [1983], because it was *my girlfriend* fifteen months prior to the incident. August [1987], however, *was* a perfect situation. But I botched it all up. She didn't die! If she had died, my name wouldn't have even made the suspect list, because she had just met me that night. (I was the prime suspect, along with a couple of other guys, in December [1983], but the police could never put enough together for an arrest. Remember, I had a *squeaky* clean reputation back then. The police were pretty sure I did it—they kept sending me anonymous notes, thinking I might 'crack'—but they couldn't find anyone who could even *say* something bad about me!)

"But Bundy was stupid *after the act*. He kept maps, schedules [and] pamphlets of the hotels, beaches [and] ski resorts he visited. He even purchased gas with credit cards (stupid!). This leaves a documented trail for the police of where you were [and] where you were headed on any given weekend. I'm surprised he didn't keep a diary, with all this other stuff he kept. (I never kept a diary)." (Emphasis in original.)

dence for evidence that is probative of a common scheme or plan, motive, intent, knowledge and identity.

The state also sought to introduce two Hartford Courant articles about serial killers that had been seized from the defendant's residence and photographs of two Styrofoam mannequin heads, also found in the defendant's residence, that had target-like markings on the throat. The state argued that the newspaper articles established that the defendant had engaged in "a course of conduct with certain progressions being made and improvements . . . ." With respect to the photographs, the state argued that the defendant had used the mannequin heads as "practice tools . . . or tools for his own arousal," and that they showed that his prior misconduct was not too remote in time.

The defendant objected to the admission of this evidence on the ground that it was highly inflammatory and prejudicial. He also contended that the prior misconduct that the state sought to introduce was not sufficiently similar to the present case to establish identity or a common scheme or plan and that the prior misconduct was too remote in time. With respect to the photographs of the Styrofoam heads and the newspaper articles, the defendant argued that there was nothing to connect him to those items.

The court ruled that the defendant's letter to the sentencing judge in New Jersey and Watson's testimony about the Osmun case were admissible to prove the defendant's intent, motive, knowledge, common scheme and plan and identity.[7] The court rejected the defendant's contention that the prior misconduct was

[7] The defendant contends that the trial court did not allow the use of the defendant's letter to the sentencing judge in New Jersey to establish a common scheme or plan or identity. The portion of the trial transcript cited by the defendant indicates, however, that the trial court denied the state's request to admit grand jury testimony by Renard on those issues, not the defendant's letter to the sentencing judge.

too remote in time because the defendant had been incarcerated during much of the intervening period. With respect to the defendant's letters to Recck dated August 1, 1988, August 25, 1988, and May 5, 1992, the court concluded that they were probative of a course of criminal activity, common scheme and plan, intent and motive. The court concluded that the June 20, 1988 letter to Recck was admissible because it corroborated the state's claim that the defendant had confessed to Pascual and rebutted the defendant's claim that he would not have made such a confession. The court did not make an express ruling with respect to the photographs of the Styrofoam heads and the newspapers articles, but those items ultimately were admitted as evidence.

Before this evidence was presented at trial, the trial court instructed the jury that it was not being admitted to prove the defendant's bad character or his tendency to commit criminal acts and that the jury could not consider the evidence to establish the defendant's predisposition to commit the crime charged or his general criminal propensity. Rather, the court instructed, the evidence was being admitted "solely to show or establish a common plan or scheme in the commission of criminal acts, the existence of the intent, which is a necessary element of the crime charged, the identity of the person who committed the crime, a motive for the commission of the crime, the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged or to corroborate crucial prosecution testimony."

The defendant claims on appeal that the evidence was not admissible for these purposes. He further claims that admission of the evidence was extremely prejudicial because it was probable that the jury would conclude that he was guilty because he had a propensity to kill women for sexual reasons.

The applicable standard of review for evidentiary challenges is well established. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 50, 905 A.2d 1079 (2006). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 352, 904 A.2d 101 (2006). "A nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357.

In support of his claim that the evidence pertaining to the New Jersey offenses was inadmissible, the defendant relies on the general rule that evidence of prior misconduct is not admissible for the purpose of establishing a defendant's propensity to engage in criminal conduct. See Conn. Code Evid. § 4-5 (a); *State* v. *Randolph*, 284 Conn. 328, 340, 933 A.2d 1158 (2007). He contends that the state's true purpose in presenting this evidence was to allow the jury to infer that, because he previously had assaulted women in order to satisfy his sexual proclivities, he had done so again in this case.

We recently have adopted an exception to § 4-5 (a) of the Connecticut Code of Evidence, however, allowing the admission of prior misconduct evidence to establish propensity in sex related cases if certain conditions are met.[8] See *State* v. *DeJesus*, 288 Conn. 418, 470–74, 953

---

[8] We note that "[j]udgments rendered in decisions that are not limited by their terms to prospective application in other cases usually are applied retroactively to other cases pending at the time. *Marone* v. *Waterbury*, 244 Conn. 1, 10–11, 707 A.2d 725 (1998)." *Perkins* v. *Fasig*, 57 Conn. App. 71, 75, 747 A.2d 54, cert. denied, 253 Conn. 925, 754 A.2d 797 (2000).

A.2d 45 (2008). Specifically, we concluded in *DeJesus* that "evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. Relevancy is established by satisfying the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) Id., 473.

"[E]vidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." (Citations omitted; internal quotation marks omitted.) Id., 473–74.

Finally, we concluded in *DeJesus* that "the admission of evidence of uncharged sexual misconduct . . . must be accompanied by an appropriate cautionary instruction to the jury" to minimize the risk of undue prejudice to the defendant. Id., 474.

Before applying these principles to the evidence at issue in the present case, we must consider as a threshold question whether our new rule allowing the admission of propensity evidence in sex related cases may

be applied when the defendant has not been charged with a sexual offense. We conclude that it may be. In *DeJesus*, we explained that the admission of propensity evidence in sex related cases is supported by two public policy considerations. "[F]irst, in sex crime cases generally . . . the offense often is committed surreptitiously, in the absence of any neutral witnesses. Consequently, courts allow prosecutorial authorities greater latitude in using prior misconduct evidence to bolster the credibility of the complaining witness and to aid in the obvious difficulty of proof. . . . Second, because of the unusually aberrant and pathological nature of the crime of child molestation, prior acts of similar misconduct, as opposed to other types of misconduct, are deemed to be highly probative because they tend to establish a necessary motive or explanation for an otherwise inexplicably horrible crime . . . and assist the jury in assessing the probability that a defendant has been falsely accused of such shocking behavior." (Citations omitted; internal quotation marks omitted.) Id., 468–70. Moreover, "[i]t is inherently improbable that a person whose prior acts show that he is in fact a rapist or child molester would have the bad luck to be later hit with a false accusation of committing the same type of crime or that a person would fortuitously be subject to multiple false accusations by a number of different victims . . . ." (Internal quotation marks omitted.) Id., 470.

We conclude that this rationale for the exception to the rule barring propensity evidence applies whenever the evidence establishes that both the prior misconduct and the offense with which the defendant is charged were driven by an aberrant sexual compulsion, regardless of whether the prior misconduct or the conduct at issue resulted in sexual offense charges. Although we stated in *DeJesus* that "[t]he scope and contours of the propensity exception to the rule prohibiting the

admission of uncharged misconduct . . . [is] rooted in this state's unique jurisprudence concerning the admission of uncharged misconduct evidence *in sex crime cases*, and must be construed accordingly"; (emphasis added) id., 473 n.35; nothing in that case suggests that it is the specific nature of the charges brought against a defendant that renders the evidence especially probative in such cases. Rather, *DeJesus* makes it clear that it is the aberrant and compulsive nature of the defendant's prior misconduct that permits a fact finder to infer that, because the defendant previously had engaged in such conduct, it is likely that he did so again. As a matter of pure logic, this rationale applies whenever the state is using the evidence of prior sexual proclivities "to establish a necessary motive or explanation for an otherwise inexplicably horrible crime"; (internal quotation marks omitted) id., 469; regardless of whether the crime itself was a sexual offense. Because, in the present case, the defendant's sexual proclivities clearly were aberrant and compulsive, and the state sought to introduce evidence of those proclivities to explain why the defendant murdered the victim, we conclude that our newly adopted rule allowing propensity evidence in sex related cases applies even though the defendant was not charged with a sex offense.

We turn, therefore, to our analysis of whether the prior misconduct evidence in the present case met the conditions for admissibility under our newly adopted rule. We first consider the defendant's claim that the prior misconduct was too remote in time. The defendant killed Osmun in 1983 and attempted to murder Renard in 1987. The victim in the present case was killed in 2001, approximately fourteen years after the attempted murder of Renard. We agree with the defendant that, ordinarily, a gap of fourteen years would raise serious questions as to whether the prior misconduct was too remote in time. The defendant was incarcerated for

eleven of those years, however, from 1988 until 1999. The Appellate Court previously has held that, where prior misconduct evidence is otherwise admissible, an extended temporal gap between the prior misconduct and the charged conduct does not render the prior misconduct evidence irrelevant if the defendant was incarcerated during that time. See *State* v. *Murrell*, 7 Conn. App. 75, 89, 507 A.2d 1033 (1986); see also *State* v. *Washington*, 693 N.W.2d 195, 202 (Minn. 2005) ("concerns about acts that are remote in time are lessened where the defendant spent a significant part of that time incarcerated").

Moreover, there was a four year gap between Osmun's death and the attempted murder of Renard, a period that exceeded the two year gap between the defendant's release from prison and the murder of the victim in the present case. Thus, the prior misconduct evidence itself tended to show that the defendant's aberrant sexual proclivities had not diminished over time, but that he was able to control them for fairly extended periods.

Finally, the evidence itself established that the defendant's sexual compulsion was not a short-term phenomenon, but was a long-standing feature of the defendant's psyche. In the 1988 letter to the sentencing judge in New Jersey, the defendant stated that he had been obsessed by thoughts of assaulting women to render them helpless since he was in second or third grade. A fact finder reasonably could conclude, therefore, that the defendant continued to be driven by the sexual compulsion that led to the prior offenses after his release from prison. Accordingly, we conclude that the prior misconduct was not too remote in time.

We next consider whether the prior misconduct was similar to circumstances of the offense with which the defendant was charged. In the case involving Osmun's

death, the defendant, who previously had dated Osmun, saw her at a party they both attended on a Saturday night. They left the party at about the same time, and the defendant followed Osmun home. Osmun invited the defendant into her apartment and they started kissing. Osmun removed her shirt and bra and, as they were "rolling around on her bed," they fell off. The defendant then attempted to strangle Osmun to death. When he was unable to do so, he retrieved a steak knife from her kitchen and stabbed her to death. The day after Osmun's death, the defendant attempted to kill himself.

In the case involving Renard, the defendant met Renard, whom he did not know, at a bar on a Saturday night. He spent several hours with her there and then followed her back to her apartment. She removed the top part of her dress and her bra and, as they were lying on a couch together, the defendant started strangling her. After Renard passed out, the defendant dragged her into the bedroom. Renard then regained consciousness and began fighting back. At that point, the defendant ran into the living room, grabbed a small knife, returned to the bedroom and stabbed Renard. When Renard continued to fight and scream, the defendant left the apartment.

In the present case, the defendant met the victim, whom he knew, at a restaurant on a Friday night. They spent several hours together, during which they were observed dancing and kissing, and they left together in the defendant's car. The victim's body was naked from the waist up when it was found.[9] Several weeks after the victim's death, the defendant attempted to kill himself.

---

[9] As we have indicated, Pascual, the defendant's cellmate, testified that the defendant told him that he had choked the victim to death, stripped her to the waist and posed her body in sexual positions before leaving the body in Rhode Island. The defendant contends that this testimony lacked credibility because it was given as part of a plea deal in which Pascual was spared the death penalty in his own criminal case, because some of Pascual's testimony was contradicted by established facts and because much of the information that could be corroborated had been published in newspaper

Thus, in all three cases, the defendant met his victim in a public place on a weekend night, socialized with her, left the public setting at the same time as the victim and engaged in voluntary sexual activities with her before committing the offenses. There was evidence to support a reasonable inference that, in all three cases, the victim was naked from the waist up at the time of the assault. In both the case involving Osmun and the present case, the defendant attempted to kill himself after the victim's death. We conclude that these similarities between the prior misconduct and the present case were substantial.

This evidence also establishes that the defendant's three victims were substantially similar. They all were adult women who socialized and engaged in voluntary sexual activities with the defendant before he assaulted them. Accordingly, we conclude that all three of the conditions for the admission of propensity evidence set forth in *State* v. *DeJesus*, supra, 288 Conn. 473, were satisfied.[10]

The defendant points out, however, that there was no independent evidence in the present case that the

articles before Pascual testified. We conclude that Pascual's testimony is not pertinent to our relevancy analysis under *DeJesus*. The testimony was intended not to establish that the victim was killed in a manner *similar* to the manner in which the defendant had killed Osmun and assaulted Renard, but to establish that *the defendant* had killed the victim. If we were to assume that Pascual was telling the truth, his testimony would be sufficient to establish the defendant's guilt and there would be no need to consider whether his conduct toward the victim was similar to his conduct toward Osmun and Renard. If Pascual was lying, there would be no basis for a conclusion that the victim was strangled.

[10] We recognize that the trial court did not instruct the jury on the proper use of evidence of prior sexual misconduct to establish propensity, as required by *DeJesus*. *State* v. *DeJesus*, supra, 288 Conn. 473–74. As in *DeJesus*, however, we conclude that the instruction given by the trial court minimized any risk that the jury would rely solely on the prior misconduct evidence in considering whether the defendant committed the charged offense or that it would convict him in order to punish him for the previous misconduct. See id., 475 n.37.

victim's murder was sexually motivated. Moreover, the Rhode Island deputy chief medical examiner testified only that death by strangulation could not be ruled out, not that it was the probable cause of the victim's death. Thus, the defendant contends, the state did not use observable similarities between the method by which the victim was murdered and the method by which the defendant assaulted Osmun and Renard to prove that the defendant must have murdered the victim. Instead, he suggests, the state impermissibly used the prior misconduct evidence to establish in the first instance that the victim was murdered in a similar manner.

We recognize that this argument has some force with respect to the state's contention that the evidence was admissible to prove identity. To be admissible for that purpose, the factual characteristics shared by the charged and uncharged crimes must be "sufficiently distinctive and unique as to be like a signature [so that] it logically could be inferred that if the defendant is guilty of one [crime] he must be guilty of the other." (Internal quotation marks omitted.) *State* v. *Randolph*, supra, 284 Conn. 347; see also *State* v. *Ibraimov*, 187 Conn. 348, 354, 446 A.2d 382 (1982) ("Evidence of other crimes or misconduct of an accused is admissible on the issue of identity where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. Much more is required than the fact that the offenses fall into the same class. The device used must be so unusual and distinctive as to be like a signature." [Internal quotation marks omitted.]). Thus, for evidence to be admissible on the issue of identity, there must be sufficient independent evidence relating to the precise method by which the charged crime was committed to allow the jury to determine that that method was identical to the method previously used by the defendant. Accordingly, to the extent that the defendant con-

tends that prior misconduct evidence admitted for the sole purpose of proving identity ordinarily cannot be used to prove the method by which the charged crime was committed in the first instance, we agree.

In the present case, however, the state was using the prior misconduct evidence primarily "to establish a necessary motive or explanation for an otherwise inexplicably horrible crime . . . ." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 288 Conn. 469. All that is required for the admission of prior misconduct evidence for that purpose in sex related cases is that the evidence meet the conditions for relevance set forth in *DeJesus*. Accordingly, we conclude that, in the present case, the lack of physical evidence concerning the precise method by which the victim was killed and the circumstances immediately surrounding her death do not render the prior misconduct evidence inadmissible. The substantial similarities among the two victims of the defendant's prior misconduct and the victim in the present case, and the defendant's conduct toward the victims before he assaulted them, were sufficient grounds for admission of the evidence.

Because we conclude that the prior misconduct evidence was admissible to establish propensity, we need not address the defendant's claims that it was not admissible to prove intent, motive, knowledge, common scheme and plan or identity. Even if the evidence was nonprobative on one or more of those issues, the only potential harm in admitting it for those purposes was that the jury could use it to infer that, because the defendant previously had assaulted one woman and killed another woman to satisfy his sexual proclivities, he had done so again. As we previously have indicated herein, the evidence properly was admissible for that purpose. Accordingly, even if we were to assume that the evidence was improperly admitted for other purposes, any impropriety necessarily was harmless.

## II

We next consider the defendant's claim that the trial court improperly excluded a third party confession to the victim's murder. The following additional facts and procedural history are relevant to our resolution of this claim. At trial, the defendant sought to admit the testimony of Hector Lopez that Alfredo Quiroga had admitted to Lopez in 2004 that Quiroga had killed the victim and the testimony of George Jordan that Quiroga had stated to him in the same year that the victim "got what she deserved" because she falsely had accused Quiroga of sexually assaulting her. Quiroga had been incarcerated with Lopez and Jordan at the time that he allegedly had made the statements. During voir dire on his proposed testimony, Lopez testified that Quiroga claimed to hear voices, took psychiatric drugs and ultimately hanged himself in jail. The defendant argued that Quiroga's statements to Lopez and Jordan were admissible as declarations against penal interest.

The state argued that Quiroga's statement to Jordan was not a statement against penal interest because Quiroga never expressly told Jordan that he had killed the victim.[11] The state also argued that neither of the alleged statements was sufficiently reliable to be admissible under the hearsay exception because: both statements were too remote in time from the date of the victim's murder; Jordan and Lopez had not been in confidential relationships with Quiroga; there was no corroborating evidence that Quiroga had killed the victim; and certain details of the alleged statements were inconsistent with the evidence.[12]

---

[11] Jordan testified that he had not learned about the victim's death until the night before the hearing on his proposed testimony, but stated that Quiroga's statement that the victim had "got what she deserved" could have been interpreted to mean that the victim was dead.

[12] The state pointed to the following inconsistencies in Quiroga's statements: Lopez testified that Quiroga had told him that he met the victim at the intersection of Broad Street and Franklin Avenue in Hartford, but those streets do not intersect; Lopez indicated that Quiroga had told him that he

The trial court concluded that Quiroga's statement to Jordan was inadmissible because it was not a declaration against penal interest. The court also concluded that Quiroga's statement to Lopez was inadmissible because it was too remote in time from the murder, Quiroga had psychiatric problems, Lopez was not someone to whom Quiroga naturally would have confessed and the statement was not corroborated by other evidence.

The general principles governing our review of evidentiary rulings are set forth in part I of this opinion. "Section 8-6 (4) of the Connecticut Code of Evidence creates an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if that statement was 'trustworthy' and, 'at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.' Accord *State* v. *Schiappa*, [248 Conn. 132, 148–49, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999)] (construing rule 804 [b] [3] of Federal Rules of Evidence, federal analog to § 8-6 [4] of Connecticut Code of Evidence). That section further instructs that, '[i]n determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest.' Conn. Code Evid. § 8-6 (4); see also *State* v. *Pierre*, 277 Conn. 42, 68, 890 A.2d 474, cert. denied, 547 U.S. 1197,

first met the victim on the night that he killed her, when Quiroga had been charged with previously sexually assaulting the victim; and Lopez stated that Quiroga had told him that he had sex with the victim before killing her, when there was no evidence that the victim had had sex immediately before she died.

126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); *State* v. *Rivera*, [268 Conn. 351, 361, 844 A.2d 191 (2004)]." *State* v. *Camacho*, 282 Conn. 328, 358, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 70. "Additionally, this court has held that, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement." (Internal quotation marks omitted.) *State* v. *Camacho*, supra, 358–59.

In the present case, the defendant contends that the trial court abused its discretion in determining that Quiroga's statements to Jordan and Lopez were too remote from the date of the murder, that Lopez and Jordan were not credible, that Jordan was not someone with whom Quiroga would have had a confidential relationship and that Quiroga's statements were not corroborated. The defendant also contends that, although Quiroga's statement to Jordan did not constitute a full confession, it was a statement against penal interest because it tended to incriminate Quiroga. *State* v. *Bryant*, 202 Conn. 676, 695, 523 A.2d 451 (1987) (exception applies not only to direct confessions, but also to statements that tend to subject speaker to criminal liability).

With respect to Quiroga's statement to Jordan that the victim "got what she deserved," we conclude that the trial court did not abuse its discretion in concluding that the statement was not admissible as a statement against penal interest. Although the statement tended to show that Quiroga had some animus toward the

victim, it did not imply that Quiroga was responsible for the victim's death.

We also conclude that the trial court did not abuse its discretion in excluding Quiroga's statement to Lopez that he had killed the victim. The statement was made two to three years after the murder and the defendant's arrest; compare *State* v. *Rivera*, supra, 268 Conn. 370 (statement made within five months of murder and before defendant's arrest trustworthy) and *State* v. *Gold*, 180 Conn. 619, 634, 431 A.2d 501 (confession made within three months of murders trustworthy), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980), with *United States* v. *Satterfield*, 572 F.2d 687, 693 (9th Cir.) (statement made two years after crime lacking in trustworthiness), cert. denied, 439 U.S. 840, 99 S. Ct. 128, 58 L. Ed. 2d 138 (1978); Quiroga was suffering from psychiatric problems at the time that he made the statement, the statement was not supported by any corroborating evidence and, indeed, was inconsistent with the evidence. We conclude, therefore, that the trial court applied the proper legal standard under the exception to the hearsay rule for statements against penal interest and reasonably concluded that Quiroga's statements to Lopez and Jordan were not sufficiently reliable or trustworthy to be admitted.

The judgment is affirmed.

In this opinion the other justices concurred.