STATE OF CONNECTICUT *v.* ANTHONY ALLEN
(SC 17701)

Rogers, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 17—officially released November 25, 2008

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom were *Thomas R. Garcia*, senior assistant state's attorney, and, on the brief, *Gail P. Hardy*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Anthony Allen, directly appeals, pursuant to General Statutes § 51-199 (b) (3), from the trial court's judgment of conviction of capital felony in violation of General Statutes §§ 53a-54b (8)[1] and 53a-8 (a),[2] murder in violation of General Statutes §§ 53a-54a[3] and 53a-8 (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[4] and 53a-54a, attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[5] and 53a-59 (a) (5),[6] and conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (5). The defendant contends that: (1) there was insufficient evidence to support his convictions; (2) the trial court improperly admitted into evidence a letter that he had

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of a person under sixteen years of age."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[6] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

written that was more prejudicial than probative; (3) the trial court improperly denied his request to poll the jury; and (4) General Statutes § 53a-35a,[7] which mandates a sentence of life imprisonment without the possibility of release for a defendant convicted of a capital felony who was under the age of eighteen at the time of the offense, violates the eighth amendment to the federal constitution. We affirm the judgment.

The record reflects the following undisputed facts and procedural history. On the evening of February 22, 2005, fifteen year old Lorenzo Morgan Rowe was fatally shot while he was walking home from a high school basketball game with several of his friends, including brothers Stanley Weaver and Jonathan Weaver. Thereafter, the state brought charges against the defendant and Kevin Amos related to that shooting. Pursuant to a request by the state, the cases were consolidated for trial. The state's theory of the case was that the victim had been shot by the defendant or Amos as a result of hostilities that previously had developed between them and the Weaver brothers. The state offered witnesses who placed the defendant at the scene and who testified that they had seen the defendant shooting in the direction of a group that included the Weaver brothers. The defendant presented alibi witnesses who testified that, although the defendant was at the basketball game, he was with a group of friends at another location at the time of the shooting.

---

[7] General Statutes § 53a-35a provides in relevant part: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a . . . ."

General Statutes § 53a-46a (h) provides in relevant part: "The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that at the time of the offense (1) the defendant was under the age of eighteen years . . . ."

The jury returned a verdict of guilty on all five counts against the defendant. The jury subsequently was unable to reach a unanimous verdict on the charges against Amos, and the trial court declared a mistrial in his case. Because the defendant was seventeen years old at the time he committed the capital felony, in accordance with § 53a-35a, the trial court imposed a total effective sentence of life imprisonment without the possibility of release.[8] This direct appeal followed.

## I

We begin with the defendant's claim that there was insufficient evidence to sustain his conviction. Specifically, the defendant contends that the evidence established that there was only one shooter and that no credible evidence established him as that shooter. With respect to the only two state witnesses who, at trial, identified the defendant as one of the shooters, the defendant points to the fact that, in statements given to the police shortly after the shooting, one witness did not identify him specifically as a shooter, and the second witness identified two other people who were with the defendant as the shooters. The defendant further contends that the forensic evidence showed that only one gun had been fired. We agree with the state that there was sufficient evidence that the jury properly could have credited to support their verdict.

In reviewing the question of whether the evidence was sufficient to sustain the conviction, we apply a two part test. "First, we construe the evidence in the light

---

[8] The trial court imposed: a sentence of life imprisonment without the possibility of release on the count of capital felony; a sentence of twenty years, concurrent to the sentence of life imprisonment, on the count of conspiracy to commit murder; and a sentence of twenty years, concurrent to the sentence of life imprisonment, on the count of attempt to commit assault in the first degree. The count of murder merged with the count of capital felony, and the count of conspiracy to commit assault in the first degree merged with the count of conspiracy to commit murder.

most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Silva*, 285 Conn. 447, 454, 939 A.2d 581 (2008).

With those principles in mind, we note that the state's witnesses offered testimony at trial as to the following course of events. In the fall of 2004, and the winter of 2005, brothers James Weaver, Jonathan Weaver, Donnell Weaver and Stanley Weaver, all in their mid to late teens, lived with their father and stepmother at 215 Branford Street in Hartford. The victim lived in the house across the street at 218 Branford Street. The Weaver brothers thought of the victim as a member of their family, like a brother or cousin. One evening in September, 2004, Jonathan Weaver, Stanley Weaver, Tynetta Muhammad, who is the mother of Stanley Weaver's child, and two other young women attended

a show at Weaver High School. As the group left the school to walk back to the Weaver house, Muhammad was jumped by a large group of young women, and a fight ensued. After Muhammad and the others made it back to the Weaver house, a smaller group of young women came to the house and reignited the fight. Among those in that group were the defendant's sister, Shawanda Allen, and his mother, Crystal Faust. Faust sprayed mace in Jonathan Weaver's face during the fight, which broke up after the Weaver brothers' father came outside.

On the evening of February 22, 2005, the four Weaver brothers, the victim, Tynetta Muhammad, her sister Khadijah Muhammad, and a few other friends (Weaver group) met at Weaver High School to watch a basketball game. At the game, James Weaver noticed a couple of young men looking their way, giving them hard looks and acting "like they wanted to do something." James Weaver called his father after the game to voice his concern, and his father told him to walk home and that he would meet them. The high school is two blocks to the north and two blocks to the west of the Weaver house. As the Weaver group left the school and walked east on Tower Avenue, which runs parallel to Branford Street, where the Weaver family and the victim lived, several of them noticed a large group of young men following them. In that group was "Ant," who later was identified as the defendant, and "Maduke," who later was identified as Amos, both of whom were wearing black pants and jackets.[9] Donnell Weaver also recognized another male, known as "Man Man," who also was dressed in black.

The Weaver group continued on Tower Avenue and turned south onto Lyme Street, where Tynetta Muham-

---

[9] The descriptions of Maduke's clothing were not entirely consistent. It is unclear what part, if any, those variances played in the mistrial in the case against Amos.

mad and Donnell Weaver noticed Ant and Maduke staring back at them from the next corner to the east on Tower Avenue at Palm Street. Palm Street runs parallel to Lyme Street, and both streets intersect two blocks to the south with Branford Street. The Weaver group continued to walk south on Lyme Street and turned east onto Branford Street. At about this same time, Donella Turmon, a friend of the Weaver brothers, was sitting outside the Weaver house at 215 Branford Street, waiting for the Weaver group to return from the game. She noticed three males, dressed in black jackets and pants, walking back and forth on Branford Street.

As the Weaver group continued east on Branford Street, they noticed three males ahead of them at the corner of Branford and Palm Streets, the corner closest to the Weaver home. The street lights were illuminated, and Jonathan Weaver, Donnell Weaver and Khadijah Muhammad were able to identify the males as Ant, Maduke and Man Man. James Weaver also was able to identify one of the three males as Ant. The three males walked north on Palm Street, but then cut through a yard and emerged on Branford Street behind the Weaver group. Turmon, Tynetta Muhammad and Khadijah Muhammad then heard gunshots coming from the direction of the three males, but could not see who was shooting. James Weaver saw two of the males pull out guns and heard shooting from two different guns, but he also could not identify who was shooting. Jonathan Weaver and Donnell Weaver, however, both identified Ant and Maduke as the shooters. Turmon and Jonathan Weaver saw the victim run across Branford Street toward his house, where he fell in his driveway. He later was pronounced dead of a single gunshot wound to the head.

The aforementioned testimony clearly was sufficient to support the verdict. Indeed, as we explain in part II of this opinion, there was other evidence that properly

was admitted to establish the defendant's motive—he was angry about statements allegedly made by two of the Weaver brothers and another male to the defendant and his friends in an earlier incident, as well as the defendant's ready access to a gun and his formation of the intent to kill. Moreover, because the defendant was charged as an accessory under § 53a-8 (a) to both the crimes of capital felony and murder; see footnote 2 of this opinion; it was not necessary for the state to prove that the defendant, rather than the other shooter, fired the fatal shot. *State* v. *Hamlett*, 105 Conn. App. 862, 866–67, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

The contrary evidence on which the defendant relies did not dictate a verdict of not guilty. "It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." *State* v. *Mullins*, 288 Conn. 345, 365, 952 A.2d 784 (2008); accord *State* v. *Amarillo*, 198 Conn. 285, 289, 503 A.2d 146 (1986) ("[t]he resolution of conflicting testimony is the province of the jury"). "If there is any reasonable way that the jury might have reconciled the conflicting testimony before them, we may not disturb their verdict." *State* v. *Myers*, 193 Conn. 457, 473, 479 A.2d 199 (1984).

The jury reasonably could have reconciled the discrepancies cited by the defendant. With respect to the physical evidence, it is true that the police recovered only four bullet casings at the scene, all of which had been discharged from the same gun, a .32 caliber automatic weapon, and the bullet recovered from the victim also had come from a .32 caliber automatic weapon. Several of the state's witnesses testified, however, that they had heard five to six shots fired, and the state's ballistics expert testified that a revolver would not discharge a bullet casing. With respect to the identifica-

tions of the defendant as one of the shooters, it is true that, in their initial statements to the police, Jonathan Weaver had identified Man Man and Maduke as the shooters, and that Donnell Weaver specifically did not identify the defendant as a shooter, only as a person involved in the shooting. The Weaver brothers testified, however, that they were distraught by the shooting and likely death of the victim when they gave their statements to the police. Moreover, Jonathan Weaver later informed the police that he had made a mistake in his statement, and at trial plausibly explained the initial misidentification by the fact that he had mixed up the "Ants," because both Man Man and Ant have the first name of Anthony. Accordingly, we conclude that the evidence was sufficient to sustain the conviction.

II

The defendant next contends that the trial court improperly admitted into evidence a letter that he had written to his girlfriend while in prison because it was more prejudicial than probative. In essence, he contends that the letter, although perhaps relevant to issues of intent, identity and motive, also contained evidence of his commission of another crime that unfairly aroused the emotions of the jury.[10] Additionally, the defendant complains that the trial court failed sua sponte to instruct the jury that it could not base his guilt on the inference that he is a bad person with a propensity for violence. The state responds that the defendant's analysis is flawed because the letter was

---

[10] Although the defendant invokes language that we traditionally employ when analyzing whether prior misconduct evidence properly was introduced, we read his claim on appeal consistently with the argument he made to the trial court and thus preserved for appellate review—that the prejudicial effect of the letter far outweighed its probative value. As our discussion demonstrates, that issue is a proper consideration whenever any sort of relevant evidence is being offered, not merely misconduct evidence. *State* v. *Ferguson*, 260 Conn. 339, 359, 796 A.2d 1118 (2002); see also Conn. Code Evid. § 4-3.

highly relevant, *direct* evidence of the defendant's involvement in the shooting at issue, and, therefore, the trial court properly admitted it into evidence. We agree with the state.

The record reflects the following undisputed facts. On March 4, 2005, the Hartford police filed a request with the correctional facility where the defendant was being held prior to trial to monitor the defendant's mail and telephone conversations. As a result, on May 12, 2005, Dominic Costantino, a correctional facility employee, intercepted a letter in an envelope bearing the return address of "Anthony Allen, 329087." The state sought to admit into evidence a section of that letter. The defendant objected, contending that the letter was more prejudicial than probative. The court overruled the defendant's objection and read into evidence the portion of the letter that the state sought to introduce. In closing arguments to the jury, the defendant acknowledged that his letter referenced his girlfriend and their child.

The following portion of the letter was read into evidence: "Bei, to tell you the truth, I was going to kill at least three people this summer. Let me tell you the names, but don't tell nobody: Kwan, Stanley, and Jonathan. Baby, one week before the game, they was talking shit to [us] but they didn't want to fight. So then we went to my house to grab a couple of guns. So then we went back over there and I got out the car with a banga. So I started to walk towards they house, and I seen them, but they didn't see me. The whole time I was thinking about you and my son. So they started to run, and I was about to shoot, but in my mind your face and Jakey's face was in front of the gun, so I couldn't shoot. So I got back in the car, and we just left."

Prior to the admission of the letter, while the evidence was being marked, the trial court instructed the jury

that "it's not uncommon when someone is arrested for a serious charge that a bond is set; and, pursuant to that bond, a person is incarcerated, at least for a portion of time, before trial." The court also instructed the jury that the defendant's incarceration does not take away or diminish his presumption of innocence.

The principles and standard by which we review a trial court's decision to admit evidence it deems relevant is well settled. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995); see also *State* v. *Burney*, 288 Conn. 548, 565, 954 A.2d 793 (2008) ("[t]he relevance requirement . . . is a fairly low hurdle").

"Relevant evidence is excluded, however, when its probative value is outweighed by the danger of unfair prejudice. *State* v. *Ferguson*, 260 Conn. 339, 359, 796 A.2d 1118 (2002); see also Conn. Code Evid. § 4-3. A determination regarding undue prejudice is a highly fact and context-specific inquiry. [T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court . . . and is subject to reversal only [when] an abuse of discretion is manifest or injustice appears

to have been done. . . . *State* v. *Rinaldi*, 220 Conn. 345, 355, 599 A.2d 1 (1991).

"To be unfairly prejudicial . . . [a] mere adverse effect on the party opposing admission of the evidence is insufficient. See [*State* v. *Ferguson*, supra, 260 Conn. 359]. Evidence is prejudicial when it tends to have some adverse effect [on] a defendant beyond tending to prove the fact or issue that justified its admission into evidence. . . . *State* v. *Graham*, 200 Conn. 9, 12, 509 A.2d 493 (1986). Trial courts must exercise their discretion cautiously in balancing the probative value of [the evidence] with any likelihood of undue prejudice to the defendant. Cf. *State* v. *McCarthy*, 197 Conn. 166, 173, 496 A.2d 190 (1985). [I]n making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. *State* v. *Graham*, supra, 14." (Citation omitted; internal quotation marks omitted.) *State* v. *Burney*, supra, 288 Conn. 565–66.

Thus, we have recognized that "[t]here are [certain] situations [in which] the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jur[ors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 888, 776 A.2d 1091 (2001), quoting *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982).

Indeed "[a]ll adverse evidence is [by definition] damaging to one's case, but [such evidence] is inadmissible

only if it creates undue prejudice so that it threatens an injustice were it to be admitted." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 329–30, 746 A.2d 761 (2000); see also *State* v. *Robertson*, 254 Conn. 739, 758, 760 A.2d 82 (2000) ("Although the [audio]tapes were prejudicial, all incriminating evidence is prejudicial. The question, rather, is whether the prejudice was unfair."). Such undue prejudice "is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." *State* v. *DeMatteo*, supra, 186 Conn. 703.

In the present case, the letter at issue contained *highly* relevant evidence that related to: the defendant's motive (two of the Weaver brothers had "talk[ed] shit to [us]," because the reference to "Stanley" and "Jonathan" created the reasonable inference that the defendant meant the two brothers); the defendant's intent to kill (as a result of what the Weaver brothers had said, the defendant decided to shoot them); and the steps the defendant took to execute his intentions (watching the brothers and approaching them with a gun in hand). This evidence was highly relevant to the issues directly involved in the case and provided little, if any, extraneous prejudicial material. Therefore, we conclude that the trial court did not abuse its discretion in overruling the defendant's objection that the prejudicial effect of the letter outweighed its probative value.

The defendant also claims, however, that the trial court improperly failed to instruct the jury sua sponte that they should not base the defendant's guilt on the inference that he is a bad person based on information in the letter. Although the defendant objected to the admission of the evidence, he did not ask for, or challenge the court's failure to deliver, a limiting instruction at trial. Essentially, he claims that a limiting instruction was a necessary part of the admission of the statements, and, thus, he is not pursuing a separate instructional

claim on appeal. The defendant views his instructional claim, which he did not preserve for our review by raising it in the trial court, as intertwined with his claim that the court improperly admitted the letter. The defendant has failed, however, to persuade us that this claim is inextricably connected to the claim of prejudice that he raised in the trial court, and he cites no authority to support the proposition that the court's failure to deliver a limiting instruction affected the admissibility of the evidence. Accordingly, he cannot prevail.

## III

The defendant also claims that the trial court improperly refused to poll the jury pursuant to Practice Book § 42-31[11] in response to what he asserts was a timely motion. He contends, therefore, that he is entitled to a new trial. We conclude that, under the circumstances of this case, the trial court properly declined to poll the jury, albeit for slightly different reasons than those cited by the trial court.

Because of the rather unusual circumstances presented in this case, we set forth in some detail the following undisputed facts as reflected in the record. Prior to trial, the state had filed notice of its intention to pursue, in the defendant's case, a sentence enhancement pursuant to General Statutes § 53-202k.[12] In accor-

[11] Practice Book § 42-31 provides: "After a verdict has been returned and before the jury have been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or they may be discharged."

[12] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

dance with well established practice, the sentence enhancement charge was not to be submitted to the jury until it had rendered a verdict on the other charges in the defendant's case.

On October 20, 2005, the fifth day of deliberations, the trial court stated that it had been apprised that the jury had reached a verdict as to the defendant, but had not yet reached unanimity in the case against Amos. The court stated its intention to accept the verdict from the jury in the defendant's case and to have the jurors return the next day to continue their deliberations in the case against Amos. The jury entered the courtroom, and, after the foreman reported the defendant's convictions, the court stated to the jury: "Ladies and gentlemen of the jury, listen to your verdict as it is accepted and recorded by the clerk. You, upon your oaths do say that . . . [as to all five counts, the defendant] is guilty. This is your verdict, so say you all?" The court then noted: "An affirmative response . . . from each and all of the jurors." The court then informed the jury that they had not yet finished their work, that they were excused for the day and that deliberations would continue the next day. Immediately after the jury left the courtroom, however, the state apprised the court and the defendant that it would not be pursuing enhancement of the defendant's sentence pursuant to § 53-202k. Discussion followed regarding the defendant's bond. Amos' attorney then informed the court that he would be seeking a mistrial on the basis of a note that the jury had sent the court earlier in the day, but that he wanted the evening to prepare his argument in connection with that motion. The court set a date for the defendant's sentencing and adjourned for the day.

The following day, immediately after court convened, the following exchange transpired between the defendant's attorney, Walter Hussey, and the court:

"[The Defendant's Attorney]: Your Honor, if I may, on behalf of [the defendant] . . . . I didn't have the opportunity yesterday to bring this before the court, but I thought about it last evening. I reviewed the Practice Book, and I would like to make a motion to have the jury polled as to their verdict. I took a look at [Practice Book §] 42-31, and, specifically, it says: 'After a verdict has been rendered and before the jury has been discharged, the jury shall be polled at the request of any party . . . .' So I would make that request at this time, Your Honor.

"The Court: I gave you plenty of time yesterday to make the motion. I looked over in your direction. Your client's not here.

"[The Defendant's Attorney]: No, he is not.

"The Court: With your consent. So I don't know what good—I don't know if I can legally poll the jury without the presence of the defendant. I'll take it under advisement. I mean, I suppose I could try to get your client here. How can I do it without your client present?"

The court then ruminated about an earlier case in which it had been involved wherein a request to poll had been made and there were multiple defendants and then stated: "[The jury] may well have been discharged on your case, which is why your defendant is not here. I've set a date for sentencing, and that's that. But I'll take it under advisement . . . . Indeed . . . if there is a verdict in the Amos case, if [Amos' counsel] asks for a poll, I may well just poll them on both. But we'll see how that goes." The defendant's attorney thanked the court, and argument regarding Amos' motion for a mistrial followed.

The jury then resumed their deliberations in the case against Amos. Following the trial court's initial denial of Amos' motion for a mistrial and before the court

recessed, a brief discussion ensued between the state and the trial court regarding two cases that addressed the issue of jury polling, *State* v. *Pare*, 253 Conn. 611, 755 A.2d 180 (2000), and *State* v. *Lopez*, 52 Conn. App. 176, 181–82, 726 A.2d 620, cert. denied, 248 Conn. 917, 734 A.2d 568 (1999). The jury later sent a note to the court indicating that it hopelessly was deadlocked in the case against Amos, and the trial court thereafter granted Amos' motion for a mistrial. The court then turned to the defendant's attorney, noted that the defendant was present and asked if he still wanted the jury to be polled. The defendant's attorney indicated that he did. The court stated that it intended to bring the jury back and inform them that he had granted a mistrial in the case against Amos, but also to question them about publicity in that morning's Hartford Courant newspaper, which included a photograph of the defendant's mother, with the caption "Mother Devastated by Murder Verdict," and an article on the verdict in the defendant's case containing statements by the defendant's attorney. The trial court again referenced the Appellate Court's decision in *Lopez*, noted the issue of jury contamination and concluded: "I don't think I'm required to [poll the jury]. In an excess of caution, I'm willing to do it, but only if I'm satisfied that the jury has not been tainted." The defendant's attorney responded: "Understood."

The jury was brought into the courtroom and told of Amos' mistrial. The court then asked them to signal by a show of hands whether they had spoken with family members or friends about the defendant's case. The court noted that there was no response, and then stated to the jury: "Now, there was some publicity after the verdict yesterday. Did any of you notice the publicity, either photographs or articles? Will you raise your hand if you did." Six jurors raised their hands, and the trial court then asked the jury to return to the jury room so

the court could decide whether to poll the jury. After the newspaper article and the photograph were marked as court exhibits without objection, the following discussion occurred.

"The Court: My concern, Mr. Hussey—of course you were entitled, absolutely, to a poll yesterday evening. I gave ample time. You were certainly entitled to a poll at that point. Given the publicity, you still [are] requesting a poll?

"[The Defendant's Attorney]: Judge . . . I think if I understand this correctly, that there cannot be any exposure to outside contact. I think if someone read about the case, that would be one thing. I think the individuals on the jury panel that had any exposure at all said they saw it, a picture. I don't think the picture could have been any worse than what happened here in the courtroom when [the defendant's] mother . . . was hysterical in the courtroom. She had to leave.

"The Court: Are you still asking—

"[The Defendant's Attorney]: Yes, I'm still asking for the jury to be polled.

"The Court: [State's Attorney Thomas] Garcia.

"[State's Attorney]: On the basis of six jurors responding that they had seen publicity on the case after leaving the building yesterday, I am opposing the polling. I think it's in a different situation than what we see in *Pare* and even in *Lopez*, where the jurors had not dispersed from the building, where they were still in the building at that time, either deliberating or in the jury room, awaiting the presence of the judge. So I think we're dealing with a distinctly different situation.

"The Court: Well, in *Lopez* [the jurors] went home, from Friday to a Monday.

"[State's Attorney]: Your Honor certainly would know that as well as anyone.

"The Court: But the—and I never inquired, because I denied the request for polling without argument, so I never inquired. All right.

"I'll deny the request for a poll of the jury. I think your comments, Mr. Hussey, to the press, together with the dramatic photograph of the defendant's mother, in the words of the Hartford Courant, 'devastated by the verdict,' no longer [make] the jury untainted, if you will. So I'll deny the request for a poll.

"May we have the jury back.

"I find that the jury was effectively discharged. They had nothing more to do after the verdict yesterday [in the defendant's case]."

On the basis of the foregoing facts, the defendant claims that the trial court improperly refused to poll the jury due to an improper determination that the jury had been "effectively discharged" on October 20, 2005. Specifically, the defendant contends that, because the jury believed that it still had the sentence enhancement charge on which to be instructed and to deliberate, the jury had not been discharged. In light of the fact that "they were still under the supervisory authority of the trial court regarding both defendants," the defendant asserts that the jurors considered themselves bound by the trial court's instructions not to talk with anyone about the case and to discuss the case only amongst themselves during their deliberations. Finally, the defendant contends that, because the jury already had seen the reaction of the defendant's mother immediately after the verdict was announced and there was no evidence that any juror had read the newspaper article concerning the case, the deliberative process had not been tainted.

The state contends in response that the jury in the present case was discharged after the court had accepted and recorded its verdict. It asserts that, in the context of this joint trial and the partial verdict against one of the defendants, the jury had completed its duties in connection with resolving the culpability of the crimes charged, and any subsequent circumstances threatened possibly to taint polling. Such circumstances in the present case, according to the state, were the jurors' continuing duties related to deliberating on the defendant's sentence enhancement[13] or resolving outstanding counts against his codefendant, Amos, or their dispersal outside the authority of the court and into the public. Although we agree with the defendant that, to the extent that the trial court relied on a finding of taint engendered by the newspaper publicity to deny the defendant's request for polling, that reliance was improper,[14] we nevertheless conclude that the trial court acted properly.

[13] For the reasons set forth in this opinion, because we agree with the state that, in the case of codefendants, when the jury has reached a verdict as to one defendant and that verdict is accepted by the court, that defendant must request that the jury be polled before it continues its obligation to deliberate on the remaining codefendant's case, we need not decide whether that request likewise must be made or deemed waived when the court has accepted the jury's verdict as to some counts against a defendant and still must deliberate on the remaining counts as to that same defendant. Therefore, we do not address the issue of whether, had the state not withdrawn the § 53-202k charge, the defendant would have been required to request that the jury be polled before it began to deliberate on that charge.

[14] It is well established that, when there has been a claim of jury misconduct, pursuant to *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), the trial court is required to conduct an inquiry to determine the nature and extent of the jury taint, if any, and that the form and scope of the inquiry and whether the misconduct was so egregious as to require the court to declare a mistrial are left to the discretion of the court. Id., 526–32; see *State* v. *Anderson*, 255 Conn. 425, 436, 773 A.2d 287 (2001). In the present case, however, the trial court relied on the fact that six jurors had "noticed" the publicity to conclude that the jury had been tainted, and did not make any inquiry into whether they actually had read the article or merely had seen the photograph of the defendant's mother, exhibiting a reaction not unlike what they already had witnessed in the courtroom. Accordingly, the

## A

"The right to poll the jury, although not of constitutional dimension, is nonetheless 'a corollary to the defendant's right to a unanimous verdict.'" *State* v. *Pare*, supra, 253 Conn. 623. Polling "enables the court to ascertain with certainty that a unanimous verdict has in fact been recorded and that no juror has been coerced or induced to agree to a verdict to which he [or she] has not fully assented." (Internal quotation marks omitted.) Id., 631–32. To effectuate this right, Practice Book § 42-31 provides in relevant part: "After a verdict has been returned and before the jury have been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. . . ." We have held that a trial court is required to conduct an individual poll of the jury pursuant to a timely request by either party and that the failure to do so constitutes a violation of § 42-31, requiring reversal of the defendant's conviction. *State* v. *Pare*, supra, 625, 636. The present case requires us to consider the meaning of "timely" when there are codefendants whose verdicts are delivered at different times. Although we previously have not had the occasion directly to address that precise issue, we do not write on an entirely clean slate.

In *State* v. *Pare*, supra, 253 Conn. 626–27, we provided significant guidance on the meaning of timeliness under the polling provision in a case involving a single defendant. In that case, the defendant had asked to have the jury polled after the jury had left the courtroom, but while the jury was waiting in the jury room for the court to address it. Id., 612. We began our analysis with the established principle that a "[f]ailure to make a timely demand or request for a poll, where there has been reasonable opportunity to do so, operates as a waiver

court never completed the task of ascertaining whether there had been any actual improper influence or taint.

of the right." (Internal quotation marks omitted.) Id., 627. In determining what constitutes a timely request under § 42-31, we concluded that, because "the trial court must conduct the poll after the verdict is returned but before the jury is discharged, then a request to poll necessarily must be made prior to the expiration of that period." Id., 628. Because § 42-31 does not define the term "discharge," we construed it "consistent[ly] with its commonly approved meaning . . . as '[t]he relieving of a witness, juror, or jury from further responsibilities in a case.' Black's Law Dictionary (7th Ed. 1999). According to that definition, a jury cannot be considered discharged so long as its members have yet to fulfill an outstanding obligation pursuant to their status as jurors." (Citations omitted.) *State* v. *Pare*, supra, 628.

Turning to the specific question of whether the jury in *Pare* still had obligations to fulfill when they were in the jury room awaiting the judge, we examined cases from other jurisdictions, in particular, *United States* v. *Marinari*, 32 F.3d 1209, 1214 (7th Cir. 1994). *State* v. *Pare*, supra, 253 Conn. 629–32. Under this case law, it was clear that "a jury is not necessarily relieved of its obligations once it retires from the courtroom. The very existence of a rule for polling a jury, and the attendant authority of the trial court to recall a jury for the purpose of conducting a poll, belies that conclusion." Id., 628–29. Rather, discharge of the jury is triggered "by the separation and dispersal of its individual members." Id., 630; accord *State* v. *Murray*, 254 Conn. 472, 495, 757 A.2d 578 (2000). "The reason usually given why it is too late to poll jurors after they have been dispersed is that they may have come into contact with outside influences. . . . Until that time, however, it can be assumed, in the absence of any indication to the contrary, that the deliberative process had not been tainted and, therefore, that the results of a jury poll will provide adequate confirmation as to whether the verdict was

reached upon full consensus of the jurors." (Citations omitted; internal quotation marks omitted.) *State* v. *Pare*, supra, 632–33.

## B

While *Pare* is instructive, as we already have indicated, we did not have the occasion therein to decide expressly the issue of when a jury is "discharged" for purposes of § 42-31 in a case like the present one, wherein codefendants are tried together and the court has entered the jury's verdict in one defendant's case but the jury is ordered to continue to deliberate on the remaining codefendant's case. That precise fact pattern, however, was before the Appellate Court in *State* v. *Lopez*, supra, 52 Conn. App. 180. In *Pare*, we distinguished *Lopez* from the case that was before us,[15] but

---

[15] In a footnote in our opinion in *State* v. *Pare*, supra, 253 Conn. 635 n.12, we noted that the state had relied on *State* v. *Lopez*, supra, 52 Conn. App. 176, for the proposition that "the jury's departure from the courtroom, upon rendering the verdict and assenting to it in open court, signals its discharge." We distinguished that case on the basis of the following observations: "*Lopez* involved the joint trial of several codefendants charged with various offenses. After the jury had returned a guilty verdict against [the defendant], it retired to the jury room to continue deliberations on an additional count against one of his codefendants. . . . Thereafter, the jury was brought back into the courtroom for further instructions on that additional count. It was not until after the court had read those instructions that defense counsel . . . requested a poll as to the verdict previously rendered against [the defendant]. The court denied that request on the ground that it had been made after the jury had effectively been discharged . . . .

"The facts of *Lopez* are distinguishable from this case. In *Lopez*, the jury had effectively fulfilled its official obligations with respect to [the defendant] prior to defense counsel's request to poll. All counts against him had been resolved, and the jury's verdict against him had been accepted and recorded by the trial court. . . . Although the jury remained intact for the purposes of resolving the remaining count against the codefendant, its members were technically free of any further obligations with respect to the case against [the defendant]. Thus, nothing in the Appellate Court's conclusion that the jury in *Lopez* had effectively been discharged for the purposes of § 42-31, when read in light of the unique facts and circumstances of the case, is inconsistent with the definition of discharge we articulate herein." (Citations omitted; internal quotation marks omitted.) *State* v. *Pare*, supra, 253 Conn. 635 n.12.

in so doing essentially signaled our approval of the court's reasoning in *Lopez*: "In *Lopez*, the jury had effectively fulfilled its official obligations with respect to [the defendant] prior to defense counsel's request to poll. All counts against him had been resolved, and the jury's verdict against him had been accepted and recorded by the trial court. . . . Although the jury remained intact for the purposes of resolving the remaining count against the codefendant, its members were technically free of any further obligations with respect to the case against [the defendant]." (Citation omitted.) *State* v. *Pare*, supra, 253 Conn. 635 n.12. In other words, we agreed that, after a jury's verdict as to one defendant is accepted by the court, the jury is discharged as to that defendant even though it remains intact for the purposes of resolving the case against the remaining codefendant.

We now are given the opportunity to address directly the reason for our implicit approval, which is simply that the reasoning in *Lopez* is a logical extension of this court's understanding of the problem of taint as expressed in *Pare*. Once a jury resumes its deliberations as to a remaining codefendant, those deliberations threaten to taint any polling as to the first defendant's verdict. In other words, the sources for tainting jury polling are different, but the concerns and rationale for the rule requiring a timely demand remain the same. Thus, although the jury may indeed have yet to fulfill an outstanding obligation pursuant to their status as jurors, by fulfilling that very obligation as to the remaining codefendant they expose themselves to potential taint. Therefore, in the case of codefendants, when the jury has reached a verdict as to one defendant and that verdict is accepted by the court,[16] the fact that

---

[16] Obviously, we recognize that juries often deliberate simultaneously as to all codefendants and announce their verdicts to the court in one session. This opinion bears significance only to the case wherein the jury declares its verdict as to one defendant and then resumes its deliberations as to any remaining codefendants.

the jury is aware that it remains under the supervision of and limitations imposed by the court protects it from being subjected to *outside* influences. But those limitations provide no insulation from *internal* influences, namely, the threat of taint posed by its continuing obligation to deliberate on the undoubtedly related charges against the remaining codefendant, the very thing that keeps it under the court's supervision. Such deliberations could cause jurors to reassess evidence or theories in the defendant's case on which the court already has accepted the jury's verdict. Therefore, when, as in the present case, the jury informs the court that it has reached a verdict in one defendant's case but still requires additional time in which to deliberate on the remaining codefendant's case, following the court's acceptance of the verdict, the defendant must request a poll before the jury resumes its deliberations.

## C

In the present case, the defendant did not make a request to poll the jury on October 20, 2005, the day that the court accepted the jury's verdict in the defendant's case. Rather, his attorney made a polling request on October 21, 2005, after the court had accepted the verdict, but just before the jury resumed its deliberations in Amos' case. That event does not end the inquiry, however, because, as indicated in the facts previously set forth, the defendant was not present when his attorney made that request. This fact and the exchange that subsequently ensued between the trial court and the defendant's attorney, which we later address, raise additional questions as to whether the request was timely or whether the defendant, in essence, waived or ineffectively raised his right to poll the jury. In other words, the mere fact that the defendant made his request before the jury resumed its deliberations in Amos' case is not dispositive in the present case. Under the unique circumstances of this case, we conclude that the defen-

dant's request to poll the jury was not effective at the time it was made and therefore was not timely.

We previously have recognized that a party must have a reasonable opportunity to make his request to poll the jury. As in *State* v. *Pare*, supra, 253 Conn. 629–32, we again find *United States* v. *Marinari*, supra, 32 F.3d 1209, instructive. The court in *Marinari* recognized that, because the failure of counsel to request a poll prior to the recording of the verdict waives the right, that period presents the presumptively proper time to make the request, as long as the parties have a reasonable opportunity prior to that time to request a poll.[17] Id., 1214–15. In that case, the court deemed the few seconds that had lapsed between the reading of the verdict and the judge's comments to the jury not to have been a reasonable opportunity. Id., 1214. The court, however, also recognized that, generally a second " 'window of opportunity' " and *typically* the last one, arises for counsel to make a request for a poll: "This is a time frame which routinely occurs in any criminal jury trial. After the judge thank[s] the jury and excuse[s] them the jurors beg[i]n leaving the jury box one row at a time and exit[ing] the courtroom. Common experience teaches that the length of time necessary for twelve jurors to depart 'single file' provides a reasonable opportunity for counsel finally to rise to his feet and announce a request for a jury poll." Id., 1215. Indeed, consistent with *Pare*, the court in *Marinari* recognized that a third window of opportunity can arise before a waiver of the right to poll will occur if the jury has not dispersed and therefore has not been subjected to any

---

[17] Because the question of what is a reasonable time is fact specific and defies precise parameters, some courts have determined that the better practice is for the trial court to inquire of both counsel if either has anything more to discuss before the jury is discharged, which, of course, invites the request to poll; see, e.g., *United States* v. *Randle*, 966 F.2d 1209, 1214 (7th Cir. 1992); we have stated that such an inquiry is not required and that it is for the parties to request a poll.

taint. Id. The court noted that, "the opportunity to exercise the defendant's right to a poll of the jury was slipping away—and it would have, but for the . . . [fact that] while the colloquy regarding [the defendant's] request to recall the jury for a poll was taking place in the courtroom, the jury remained sequestered in the jury room, awaiting a security escort to the parking lot." Id. Accordingly, the jury was available to be recalled and polled, and the delayed request for a poll was timely. Id.

In the present case, we do not conclude that, by failing to ask that the jury be polled *immediately* after the court recorded its verdict, the defendant waived his right to a poll by merely waiting and watching as the jury left the courtroom. Indeed, we do not decide the claim raised by the state as to whether the defendant should have asked for the jury to be polled before it was supposed to begin deliberations on the defendant's § 53-202k sentence enhancement charge. See footnote 13 of this opinion. We do conclude, however, that, *after* the state indicated that it would not be pursuing the § 53-202k charge, a timely request from the defendant's attorney would have given the trial court the proper opportunity to recall the jury. Even if the trial court had not been able to reassemble the jury, which *just* had left the courtroom, his request would have ensured the defendant's presence the next morning before the jury resumed their deliberations in Amos' trial.

As the trial court remarked the next morning when counsel *did* make the request, "I gave you plenty of time yesterday to make the motion. I looked over in your direction." The defendant's attorney remained silent, however, on October 20, 2005, which the trial court reasonably understood as a waiver of a request to conduct a poll at that time. See *State* v. *J.R.*, 69 Conn. App. 767, 771, 797 A.2d 560 (trial court was in unique position to draw factual impressions from observation of demeanor of counsel and flow of conversation during

colloquy after jury left courtroom), cert. denied, 260 Conn. 935, 802 A.2d 89 (2002); see, e.g., *United States* v. *Beldin*, 737 F.2d 450, 455 (5th Cir.) (failure to object to discharge of jury or to request that jury be recalled constituted waiver of right to poll), cert. denied, 469 U.S. 1075, 105 S. Ct. 572, 83 L. Ed. 2d 512 (1984); *United States* v. *Marr*, 428 F.2d 614, 615 (7th Cir. 1970) (concluding that there had been waiver of right to poll when no request for poll or recall of jury occurred).

As in *United States* v. *Marinari*, supra, 32 F.3d 1212–13, the defendant in the present case received another "window of opportunity" the next morning when his attorney made the request and the trial court inquired about the defendant's absence and whether the court properly could poll the jury under those circumstances. Significantly, the defendant's attorney did not contend that the court could act in the defendant's absence because polling was not a critical stage in the proceedings. See *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004) ("[i]n judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge" [internal quotation marks omitted]). Nor did the defendant's attorney assert that the defendant had waived his right to be present, even if this was a critical stage of the proceedings. As a result, the trial court ordered that the defendant be brought to court, later noting that the defendant would not be there until 2 p.m. that afternoon. Additionally, when the trial court stated first, that it would take the request to poll the jury under advisement and thereafter that it *might* grant the request in the defendant's case *if* there was a verdict in Amos' case and *Amos' counsel* made a polling

request,[18] the response of the defendant's attorney simply was: "Very well," and "[t]hank you." As a consequence, the trial court reasonably allowed the proceedings to continue and the jury, which already had deliberated in the case for five days, resumed its deliberations in the case against Amos. Therefore, the final window of opportunity for polling had closed. What otherwise could have been a timely request to poll, had the defendant's attorney ensured that the defendant would be present or that his presence had been waived, failed.

IV

Finally, the defendant claims that § 53a-35a (1), which mandated his sentence of life imprisonment without the possibility of release for his conviction of a capital felony; see footnote 7 of this opinion; imposes cruel and unusual punishment in violation of the eighth amendment to the federal constitution.[19] Essentially he contends that, in light of the United States Supreme Court's decision in *Roper* v. *Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), wherein the

---

[18] It is clear from the record that the trial court did not agree to conduct a poll, only that it would consider it if numerous other conditions were to occur. Accordingly, it also is clear that the trial court did not induce the defendant's attorney to rely on anything the court did or stated; as we previously have discussed in this opinion, the defendant already had failed to exercise properly his right to have the jury polled by the time the trial court made these statements.

[19] Although the defendant claims in his brief to this court that the statutory mandate of § 53a-35a (1) constitutes cruel and unusual punishment in violation of both the state and federal constitutions, he has provided no independent analysis under the state constitution, as required under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and we therefore limit our review to the federal constitution. *State* v. *T.R.D.*, 286 Conn. 191, 207 n.14, 942 A.2d 1000 (2008). The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The eighth amendment's prohibition against cruel and unusual punishments is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Estelle* v. *Gamble*, 429 U.S. 97, 101, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

court held that the eighth amendment forbids imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed, we should conclude that § 53a-35a (1) similarly violates the constitutional prohibition against cruel and unusual punishment. The defendant contends that the sociological and physiological evidence on which *Roper* relied, which demonstrates that persons under the age of eighteen differ from adults in terms of their culpability and moral responsibility, necessarily dictates a similar result because a life sentence without the possibility of release excludes the possibility of rehabilitation, the main objective for juvenile offenders. We disagree.[20]

In *Roper*, the United States Supreme Court held that execution of individuals who were under eighteen years of age at the time of their capital crimes violates the eighth amendment's prohibition against cruel and unusual punishment. Id. "The scope of *Roper*, [however] is narrow: it applies only where an individual under eighteen years of age is sentenced to death." *Douma* v. *Workman*, United States District Court, Docket No. 06-CV-0462, 2007 WL 2331883, *3 (N.D. Okla. August 13, 2007); accord *United States* v. *Salahuddin*, 509 F.3d 858, 864 (7th Cir. 2007) ("*Roper* held that executing a person for conduct that occurred before the offender was eighteen violates the [e]ighth [a]mendment, but it permitted imposing a sentence of life imprisonment based on conduct that occurred when the offender was a juvenile"); *Sharikas* v. *Kelly*, United States District Court, Docket No. 1:07cv537, *4 (E.D. Va. April 7, 2008) ("[The] petitioner was under [eighteen] years of age at the time of his offenses, but was sentenced to terms of life imprisonment, not death. Accordingly, even if *Roper* were retroactively applica-

---

[20] Although the defendant did not raise this issue in the trial court, he properly has sought review of his constitutional claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

ble, it did not announce a new constitutional right which is applicable to [the] petitioner's case."); *Smith* v. *Howes*, United States District Court, Docket No. 06-CV-10905, 2007 WL 522697, *2 (E.D. Mich. February 14, 2007) (stating that *Roper* does not apply to cases in which petitioner is not facing execution); see also *Pineda* v. *LeBlanc*, United States District Court, Docket No. 07-3598, 2008 WL 294685, *3 (E.D. La. January 31, 2008) (concluding that, "although *Roper* was retroactive to death cases on collateral review, it did not retroactively apply to life sentences"); *Schane* v. *Cain*, United States District Court, Docket No. 07-1068, 2007 WL 4967081, *4 (W.D. La. October 24, 2007) (same); *Culpepper* v. *McDonough*, United States District Court, Docket No. 8:07cv672, 2007 WL 2050970, *4–5 (M.D. Fla. July 13, 2007) (same). Thus, the court in *Roper* recognized that the death penalty is different. Life without the possibility of release does not completely eliminate the possibility of rehabilitation; that possibility exists while the offender remains in prison.

A recent case decided by the Delaware Supreme Court, *Wallace* v. *State*, 956 A.2d 630 (Del. 2008), provided a comprehensive analysis in rejecting an identical claim. We adopt that court's reasoning in its entirety in concluding that the defendant's right to be free from cruel and unusual punishment was not violated.

"Every state provides some mechanism for the imposition of adult sentences on a juvenile offender for at least some sort of crime.[21] In other jurisdictions, there is no evident trend away from imposing serious adult criminal liability upon juvenile offenders. . . . [I]n forty-nine states, the age at which a first degree mur-

---

[21] "See [H. Snyder & M. Sickmund, Juvenile Offenders and Victims: 2006 National Report (U.S. Dept. of Justice, Office of Justice Programs, Office of Juvenile Justice & Delinquency Prevention 2006) c. 4, p. 111]." *Wallace* v. *State*, supra, 956 A.2d 640 n.37.

derer can face adult disposition is fourteen years or younger.[22] Forty-two states permit the sentencing of juveniles to life without parole.[23] In twenty-seven of those states, the sentence is mandatory for anyone, child or adult, found guilty of [m]urder in the [f]irst [d]egree.[24] . . . [I]n the past twenty years, courts have consistently rejected [e]ighth [a]mendment claims made by juvenile murderers attacking their life sentences.[25]

[22] "[H. Snyder & M. Sickmund, Juvenile Offenders and Victims: 2006 National Report (U.S. Dept. of Justice, Office of Justice Programs, Office of Juvenile Justice & Delinquency Prevention 2006) c. 4, pp. 111–14]." *Wallace* v. *State*, supra, 956 A.2d 640 n.38.

[23] "[H. Snyder & M. Sickmund, Juvenile Offenders and Victims: 2006 National Report (U.S. Dept. of Justice, Office of Justice Programs, Office of Juvenile Justice & Delinquency Prevention 2006), c. 4, pp. 111–14]." *Wallace* v. *State*, supra, 956 A.2d 640 n.39.

[24] "Amnesty International, Human Rights Watch, The Rest of Their Lives: Life Without Parole for Child Offenders in the United States [(2005) p. 1]." *Wallace* v. *State*, supra, 956 A.2d 640 n.40.

[25] In support of that statement, the Delaware Supreme Court in *Wallace* v. *State*, supra, 956 A.2d 640 n.41, relied on the following authority as cited by the state: *Rice* v. *Cooper*, 148 F.3d 747, 752 (7th Cir. 1998), cert. denied, 526 U.S. 1160, 119 S. Ct. 2052, 144 L. Ed. 2d 218 (1999); *Harris* v. *Wright*, 93 F.3d 581, 583–85 (9th Cir. 1996); *Rodriguez* v. *Peters*, 63 F.3d 546, 566–67 (7th Cir. 1995); *Foster* v. *Withrow*, 159 F. Sup. 2d 629, 645–46 (E.D. Mich. 2001), aff'd, 42 Fed. Appx. 701 (6th Cir. 2002); *Valenzuela* v. *People*, 856 P.2d 805, 810 (Colo. 1993); *Tate* v. *State*, 864 So. 2d 44, 54 (Fla. App. 2003); *Phillips* v. *State*, 807 So. 2d 713, 716–17 (Fla. App.), review denied, 823 So. 2d 125 (Fla. 2002), cert. denied, 531 U.S. 1161, 123 S. Ct. 966, 154 L. Ed. 2d 896 (2003); *People* v. *Cooks*, 271 Ill. App. 3d 25, 40–41, 648 N.E.2d 190, appeal denied, 162 Ill. 2d 571, 652 N.E.2d 344 (1995); *State* v. *Pilcher*, 655 So. 2d 636, 643–44 (La. App.), cert. denied, 662 So. 2d 466 (La. 1995); *People* v. *Bentley*, 2000 WL 33519653, *2 (Mich. App. 2000); *People* v. *Launsbury*, 217 Mich. App. 358, 363, 551 N.W.2d 460 (1996), appeal denied, 454 Mich. 883, 562 N.W.2d 203 (1997); *State* v. *Garcia*, 561 N.W.2d 599, 609 (N.D.), cert. denied, 522 U.S. 874, 118 S. Ct. 198, 139 L. Ed. 2d 131 (1997); *Commonwealth* v. *Carter*, 855 A.2d 885, 892 (Pa. Super.), appeal denied, 581 Pa. 670, 863 A.2d 1142 (2004); *State* v. *Jensen*, 579 N.W.2d 613, 624–25 (S.D. 1998); *State* v. *Powell*, 34 S.W.3d 484, 494 (Tenn. Crim. App.), appeal denied, 2000 Tenn. LEXIS 539 (2000); *Laird* v. *State*, 933 S.W.2d 707, 714 (Tex. App. 1996); *Speer* v. *State*, 890 S.W.2d 87, 92–93 (Tex. App. 1994); *State* v. *Loukaitis*, 97 Wash. App. 1090, 1999 WL 1044203, *13 (1999); *State* v. *Massey*, 60 Wash. App. 131, 145–46, 803 P.2d 340, review denied, 115 Wash. 2d 1021, 802 P.2d

"In [*Roper* v. *Simmons*, supra, 543 U.S. 566], the United States Supreme Court noted the 'particular trend in recent years toward cracking down on juvenile crime.' However, in *Roper*, the United States Supreme Court concluded that 'neither retribution nor deterrence provides adequate justification for imposing the death penalty on juvenile offenders.' The Supreme Court nevertheless also stated that it could not 'deny or overlook the brutal crimes too many juvenile offenders have committed.' Consequently, it held that 'when a juvenile offender commits a heinous crime, the [s]tate can exact forfeiture of some of the most basic liberties, but the [s]tate cannot extinguish his life and his potential to attain a mature understanding of his own humanity.'

"In *Roper*, the United States Supreme Court stated that '*it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.*' We conclude that the United States Supreme Court, in *Roper*, would not have recognized a sentence of life without parole as an acceptable alternative to death as a punishment for juveniles who commit intentional [m]urder in the [f]irst [d]egree, if such a sentence would violate the [e]ighth [a]mendment." (Emphasis added.) *Wallace* v. *State*, supra, 956 A.2d 640–41; see also *United States* v. *Feemster*, 483 F.3d 583, 588 (8th Cir. 2007) ("[a]lthough the execution of a juvenile is impermissible under the [e]ighth and [f]ourteenth [a]mendments [to

126 (1990), cert. denied, 499 U.S. 960, 111 S. Ct. 1584, 113 L. Ed. 2d 648 (1991); and *State* v. *Stevenson*, 55 Wash. App. 725, 737–38, 780 P.2d 873 (1989), review denied, 113 Wash. 2d 1040, 785 P.2d 827 (1990). We also note that our research has revealed the following additional authority that was decided after *Roper*. See *People* v. *Galvez*, 2007 WL 2377339, *11–12 (Cal. App. 2007); *State* v. *Craig*, 944 So. 2d 660, 662 (La. App. 2006), cert. denied, 959 So. 2d 518 (La.), cert. denied, 552 U.S. 1062, 128 S. Ct. 714, 169 L. Ed. 2d 554 (2007); and *State* v. *Rideout*, 182 Vt. 113, 130, 933 A.2d 706 (2007).

the federal constitution], sentencing a juvenile to life imprisonment is not"), vacated and remanded on other grounds, 552 U.S. 1089, 128 S. Ct. 880, 169 L. Ed. 2d 718 (2008); *Culpepper* v. *McDonough*, supra, 2007 WL 2050970 (same).

We recognize that the overwhelming majority of countries around the world do not permit the imposition of a mandatory life sentence on a person under the age of eighteen; see Amnesty International, Human Rights Watch, The Rest of Their Lives: Life Without Parole for Child Offenders in the United States (2005) p. 106 available at http://www.amnestyusa.org/countries/usa/clwop/report.pdf (only fourteen countries permit life sentences for juveniles, either with or without possibility of release); and that the Supreme Court indicated in *Roper* that international practices are relevant to this constitutional question. *Roper* v. *Simmons*, supra, 543 U.S. 578. Moreover, we agree that the large number of juveniles serving life sentences in the United States as compared to those few other countries that permit such a sentence raises deeply troubling questions. See Amnesty International, supra, pp. 1, 106 (estimating that there are 2225 juveniles serving life sentences in United States, but only twelve in rest of world). The courts are in consensus, however, that the United States Supreme Court clearly has signaled that such a sentence does not violate the eighth amendment. The delineation between juveniles and adults for purposes of prosecution and punishment is a public policy determination reserved to the legislative branch of government, except where constitutional principles apply. The eighth amendment affords heightened significance to the "diminished culpability" of juveniles, but the reasoning of *Roper* does not extend to the present case. Accordingly, in the absence of a constitutional prohibition against the imposition of a life sentence without the possibility of

release, the wisdom of this sentencing scheme remains with the legislature.

The judgment is affirmed.

In this opinion the other justices concurred.