STATE OF CONNECTICUT *v.* DAVID WAYNE BELL
(AC 29893)

McLachlan, Gruendel and Pellegrino, Js.

---

Argued December 5, 2008—officially released March 3, 2009

*Moira L. Buckley*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary W. Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, David Wayne Bell, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and assault of a pregnant woman resulting in the termination of pregnancy in violation of General Statutes § 53a-59c.[1] On appeal, the defendant claims that the trial court improperly (1) admitted hearsay testimony, (2) admitted evidence of an Amber Alert and (3) instructed the jury regarding consciousness of guilt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In September, 2004, Sarah Tarini lived in a two bedroom second floor apartment at 16 Mosher Street in Meriden with her minor daughter, Michael Fontanella and Shanna Kropp.[2] On September 1, 2004, Jennifer Helmedach, her infant daughter and her boyfriend, the defendant, arrived at Tarini's apartment and asked to spend the night, as they were going to visit family in

[1] The defendant was also convicted of committing felony murder in violation of General Statutes § 53a-54c. The court merged the conviction of felony murder with the conviction of murder and sentenced the defendant only on his murder conviction.

[2] Tarini's daughter occupied one bedroom, Fontanella and Kropp shared the second bedroom, and Tarini slept in the living room.

New York the next day.[3] Tarini allowed Helmedach, her daughter and the defendant to stay in the room usually shared by Fontanella and Kropp. Helmedach and the defendant spent most of September 1, 2004, in the bedroom, and the defendant would periodically come out in the living room, sit in a chair and play with a small pocketknife.

On September 2, 2004, Helmedach left the apartment with her baby sometime between 2 and 5 p.m. for twenty to thirty minutes to make a pay telephone call. That day, Helmedach was wearing a black see through shirt, and the defendant was wearing baggy jeans, a white T-shirt and a white cloth on his head. At approximately 6:30 p.m., Helmedach and the defendant left the apartment, leaving Helmedach's baby in the apartment and stating that they were going down the street to use a pay telephone and to find a ride. Helmedach and the defendant returned thirty or forty minutes later.

Sometime around 5 p.m., the victim, twenty year old Faye Bennet, left the apartment she shared with her boyfriend, Keiwah Burton, for her mother's house. Bennet was six or seven months pregnant with Burton's baby. At approximately 7 p.m., she called Burton, told him that she had just finished taking Helmedach shopping for her baby and that she was going to "chill" with Helmedach and invited him to join them. Burton declined her invitation.

At approximately 7:30 p.m., Tarini left the apartment with her daughter, Fontanella and Kropp to buy some cellular telephone minutes at a nearby store. Before leaving, Tarini informed Helmedach and the defendant that she was leaving. Fontanella also informed Helmedach and the defendant that they were leaving, and they stated that a ride was coming for them. When

---

[3] Tarini was Helmedach's neighbor when they both lived in Middletown.

Tarini's group left, Helmedach, Helmedach's daughter and the defendant were alone in the apartment.

At approximately 7:45 p.m., Scott Baustien, the resident of the first floor apartment, noticed two women, appearing to be in their early twenties, walk by his living room window from the driveway toward the front of 16 Mosher Street. One woman was visibly pregnant and wearing a blue or gray "summery" dress. The other woman, Helmedach, had longer hair and was a little taller. Baustien heard the two women walk up to the second floor, knock and walk into the second floor living room after which he heard some thumping noises. Baustien noticed also that a red sport-utility vehicle, resembling a Chevrolet Blazer, was blocking the driveway.

At approximately 7:53 p.m., Baustien called Clarence Labbe, the resident of the third floor apartment, on his cellular telephone. Baustien called because Labbe's vehicle was blocked in by the red sport-utility vehicle. At approximately 8 p.m., Labbe was watching television with his wife when he heard some banging and thumping in the second floor apartment. At the time, Labbe was in his bedroom, directly above a bedroom in Tarini's apartment. Labbe thought it was children playing because he did not hear yelling. Labbe also spoke with Baustien about the noises, which were upsetting Baustien because he had to wake up early for work.

Baustien went outside because the red sport-utility vehicle was blocking the driveway and saw the woman, who was not pregnant, who had walked by his window earlier. Baustien noticed that there was a baby in the passenger seat and told the woman that she could not park there. He noticed that she looked nervous and apologized before she drove quickly toward the road.[4]

[4] Baustien picked Helmedach out of a photographic array as the woman he had encountered.

After the noises downstairs stopped, Labbe heard someone leave the building, a vehicle start, the squeal of tires as a vehicle traveled down the driveway and a smash into the building. Labbe went to the window to see what had happened but noticed only that the red sport-utility vehicle was no longer in the driveway and heard a horn sound twice from in front of the apartments. Carol Lamb, a nearby resident, was outside washing her car when she saw the red Chevrolet Blazer back down the driveway of 16 Mosher Street and hit the corner of the house. Lamb could see that the driver was female and heard a baby crying inside the vehicle after it struck the house. Lamb saw the vehicle continue to back up and pull up in front of the house. She heard the horn beeping and went into her house.

Tarini, her daughter, Fontanella and Kropp returned to their apartment between 8:15 p.m. and 8:30 p.m. Tarini sent her daughter to her bedroom because it was close to her bedtime and then knocked on the other bedroom door. When Tarini received no response, she opened the door and discovered a lot of blood and a garbage bag containing a body on the bed. Tarini asked Fontanella to bring Tarini's daughter to Labbe's apartment, so that her daughter would not have to see anything, and called 911. At approximately 8:39 p.m., Labbe called Baustien, and they both went to the second floor apartment and saw a body in the bedroom.

At approximately 8:41 p.m., Meriden police Captain Timothy Topulos and Officer Justin Hancort arrived at 16 Mosher Street. The officers met Tarini and Fontanella, who appeared very upset and visibly shaken, outside the building. Upon entering and proceeding up the stairway, they encountered Kropp sitting on the staircase. The officers entered the second floor apartment and encountered Baustien in the kitchen. Baustien, as requested, left the apartment and returned to his residence on the first floor. Tarini later identified

the defendant for the police from a photograph and provided a written statement.[5]

The officers walked toward the bedroom and discovered blood on the carpet and the walls and a green plastic garbage bag on a mattress on the floor. Next to the bloodstains was a baby bottle with some milk or formula in it. After determining that no one was in the closet, the officers observed a body inside the garbage bag. Topulos called in emergency medical personnel to evaluate the victim. Medical personnel arrived and determined that the victim was deceased. Topulos began a search for a second victim because of his observation of the baby bottle. In addition, Christopher Sudock, a detective with the state police central district major crime squad, observed a container of powdered infant formula along with the baby bottle containing liquid milk or formula.

The victim was initially misidentified at the scene as Helmedach.[6] When the victim's body was being removed by employees of the office of the chief medical examiner, however, Sudock observed a tattoo on her right shoulder, which read "Faye." The victim's identity was verified during the autopsy through fingerprint identification as Faye Bennet.

Bennet had petechial hemorrhages on her face that are typical of a premortem physical obstruction to the flow of blood in the neck. Bennet also suffered bruising on her jaw, cuts and abrasions on her neck, six stab wounds to her neck and upper torso and defensive wounds on both hands. Several of the stab wounds were irregular, suggesting that either the knife was twisted or

---

[5] In front of the jury, Tarini again identified the defendant as Helmedach's boyfriend and the visitor to her apartment from September 1 to September 2, 2004.

[6] Bennet and Helmedach resembled each other; when Fontanella was asked about a photograph of Helmedach, he testified that the woman "looks like Faye."

Bennet moved as the injury occurred. Although the stab wounds would have caused her death without medical intervention, Bennet's death was hastened by manual strangulation.

At the time of her death, Bennet had been carrying a male fetus, approximately twenty-seven weeks along, with no diseases, anomalies or injuries. The cause of the termination of the pregnancy was Bennet's death.

Next to the mattress on which Bennet's body was discovered, Sudock found a torn white tank top with red blood like stains. Sudock also discovered a white pillowcase containing red blood like stains and a shoe sole print pattern in a blood like substance from the area next to Bennet's body. After observing bruising on Bennet's neck that he suspected was from a ligature, Sudock seized an electric blanket in the bedroom with a blood like substance on the cord. A portion of rug near the electric blanket had a large concentration of blood.

After the victim and the defendant were identified, Robert Pekrul, a detective with the Meriden police department, attempted to locate the defendant, Helmedach, Helmedach's daughter and Bennet's Chevrolet Blazer. After exhausting local leads, the Meriden police department issued an Amber Alert. The information about the three individuals and the vehicle was advertised on electronic signs on the highway, as well as via the news media. The same information was entered into the National Crime Information Center system for dissemination to other law enforcement agencies.

On September 3, 2004, Bennet's Chevrolet Blazer was recovered in East Orange, New Jersey, and transported to Meriden. When it was processed on September 8, 2004, the vehicle contained a white towel with blood like staining, a black see through shirt with floral print and a pair of men's denim jeans, size forty, with blood

like stains. In addition, there were blood like stains on the passenger side front seat, toward the center console of the vehicle.

On September 4, 2004, at approximately 10:30 a.m., Pekrul learned that Helmedach's daughter had been brought to the East Orange police department by the defendant's sister, Shrae Miller. On September 4, 2004, Pekrul interviewed Miller but obtained no information leading to the defendant or Helmedach. On September 10, 2004, he reinterviewed Miller and learned that the defendant was connected to Danisha Fondeur of the Bronx, New York. Pekrul traveled to Fondeur's apartment building where he remained until he observed the defendant and Helmedach walking past the doorway outside. Pekrul arrested the defendant and Helmedach and found a folding knife on the defendant. At the time of his arrest, the defendant was wearing Air Jordan sneakers. Without prompting, the defendant stated: "My life is over anyway, and I'm gonna get the needle for the murder and attempted murder." The defendant also stated that if he had known the police were coming, he would have killed them. During the booking process in New York, the defendant stated, "I killed the bitch." Once back in Connecticut, while various items were being taken from the defendant by the police, he began to laugh and stated, "I stabbed the bitch."

James Streeter, an imprint impressions examiner for the state police forensic science laboratory, examined the footwear impression on the pillowcase found near Bennet's body. Streeter compared the impression with the sole of the left shoe of the pair of black Air Jordan sneakers that the defendant was wearing when he was arrested. Streeter concluded that the patterns were alike in size, shape and design.[7]

[7] Streeter testified that the sneakers had no individualizing characteristics that would allow for him to determine that they "matched" the impression on the pillowcase.

Nicholas Yang, the lead criminalist in the deoxyribonucleic acid (DNA) section of the state police forensic science laboratory, analyzed swabs taken from the defendant's Air Jordan sneakers and determined that Bennet was included as a contributor to stains on both sneakers.[8] Yang also analyzed stains on the jeans seized from Bennet's Chevrolet Blazer on September 8, 2004. Bennet was also included as a contributor to one stain[9] and included as the single source for another stain. The expected frequency of individuals who could be the source of the DNA profile in the latter stain is less than one in seven billion in any ethnic population.[10]

On September 13, 2004, the defendant agreed to speak with Pekrul and his partner, Detective Dennis Sullivan, about the events of September 2, 2004. After confessing to the detectives, the defendant agreed to give a tape-recorded statement documenting his confession.

The defendant recounted the following story in his taped confession.[11] On September 2, 2004, approximately ninety minutes before he killed Bennet, the defendant had a fight with Helmedach, and Helmedach left the apartment with her daughter. The defendant, Tarini and Fontanella then discussed robbing different

---

[8] The bloodstains on the sneakers contained DNA from more than one individual. The expected frequency of individuals who could contribute to the DNA mixture on the left sneaker is approximately 1 in 60 for the African-American population, 1 in 30 for the Caucasian population and 1 in 45 for the Hispanic population. The expected frequency for the mixture on the right sneaker is approximately 1 in 605,000 for the African-American population, 1 in 63,000 for the Caucasian population and 1 in 151,000 for the Hispanic population.

[9] The expected frequency of individuals who could contribute to the DNA mixture on the jeans is approximately 1 in 1090 for the African-American population, 1 in 540 for the Caucasian population and 1 in 750 for the Hispanic population.

[10] This statistical frequency is the highest number that the laboratory will issue because it reflects the approximate population of Earth.

[11] The audiotaped confession was played for the jury and admitted as an exhibit.

people, and, after Fontanella and Kropp left the apartment to buy cellular telephone minutes, he and Tarini decided to rob Bennet. Tarini called Bennet and had her come to Tarini's apartment for a drug deal. The plan was to kill Bennet and then rob her, which is why the defendant made sure a garbage bag was available. The defendant told Tarini that if Bennet came with a man, he would kill the man and Tarini would have to kill Bennet.

Bennet arrived at the apartment door at the same time as Helmedach and her baby. The defendant grabbed Bennet hard, put her in a choke hold and squeezed so that she would not scream. The defendant had given Tarini the knife to hold because he would not be able to get it out of his pocket once he grabbed Bennet. Tarini opened the door to the bedroom, and the defendant dragged Bennet into the room. The defendant stabbed Bennet in the throat with the knife. Bennet surprised the defendant by continuing to fight, and the defendant stabbed her again. Bennet was able to grab the knife and wrest it away from the defendant. Tarini handed the defendant a pillow, which he pushed down on Bennet's face while he tried to get the knife back. Bennet pleaded with the defendant, stating: "[M]y baby. David, stop!" After the defendant held the pillow over Bennet's face, she stopped fighting but was still alive, so the defendant tried to break her neck. He and Tarini then wrapped Bennet in a blanket, folded her body and put the bag over her.

The defendant changed his bloody shirt and ran downstairs. Helmedach was sitting on the front porch, being yelled at by a man, when the defendant went outside. The defendant grabbed her baby, threw Helmedach the keys and told her they were leaving the state in Bennet's vehicle. They stopped at a gasoline station in Bridgeport or New Haven and searched the car for Bennet's drugs or other valuable belongings.

They found marijuana, prenatal vitamins, credit cards with receipts and $430. The defendant sent Helmedach into the gasoline station to try to use Bennet's cards at the automated teller machine.[12] After Helmedach was unsuccessful at the teller machine, the defendant put the credit cards in his pocket.[13]

The defendant drove to Miller's residence in New Jersey to leave the baby with her. The defendant changed his clothes in the car because they were bloody, left the car keys and took Bennet's cellular telephone and threw it into a patch of flowers. Miller's father called her and asked about Bennet's murder because the defendant's name and face were broadcast on the television news. The defendant unplugged the telephone so that no one else could call and asked Miller to get him a hotel room under an assumed name. The defendant and Helmedach spent the night in the hotel, left between 4:30 and 5:30 a.m., and returned to Miller's house to leave Helmedach's daughter there. The defendant and Helmedach took a train to the Bronx. The defendant stayed in Fondeur's apartment in the Bronx for two days with Helmedach. After that, the defendant broke into another apartment on the same floor via the fire escape.

The defendant stated that he kept Helmedach with him so that she could not be a witness. The defendant stated that the only reason he left witnesses behind was that it took so long for him to knock Bennet down and "put her out." The defendant stated that if he knew that the police were coming for him the day he was arrested, he would have run. The defendant also admitted that he was wearing the black Air Jordan sneakers that he was arrested in when he killed Bennet. The

---

[12] The defendant, seeing that each receipt had four numbers on it, thought that the four numbers were personal identification number codes for Bennet's credit cards.

[13] The defendant later tried to use Bennet's credit cards in New Jersey.

defendant also stated: "If I had a gun, I would have shot you all. It would have been a wrap. . . . I would have shot you all."

## I

The defendant first claims that the court abused its discretion by allowing Burton's hearsay testimony regarding Bennet's statements describing a past event. Specifically, the defendant challenges the introduction of "Burton's testimony regarding Bennet's statements that she *had already* gone shopping with Helmedach."[14] (Emphasis in original.) We disagree.

Burton testified that Bennet called him at about 7 p.m. on September 2, 2004, and "told [him] she just finished taking [Helmedach] shopping for her baby, or whatever the case may be, but they had been shopping; that's what she told me or whatever and that . . . [s]he told me that she was taking—that she already took her friend out, you know, to go shopping for the baby, bought the baby some things and they were gonna go chill, or whatever the case, do—whatever it is females do together, whatever, and that's what she told me." The court gave a limiting instruction that "the testimony [the jury had] just heard about the cell phone conversation about where . . . Bennet was going to go. I will tell you that any statement that . . . Bennet made with respect to her intention to go to a particular place is admissible only to establish her own conduct. In other words, it's evidence that she completed what she indicated she was going to do. It is not evidence of any conduct or intention on the part of anybody else she mentioned, which would be [Helmedach]. It's not evidence at all as to [Helmedach's] conduct or

---

[14] The defendant states that "[o]n appeal, [he] is not challenging Burton's testimony regarding Bennet's statements that she was *going to* spend time with Helmedach . . . ." (Emphasis in original.)

[Helmedach's] intentions. It relates solely to the intention of . . . Bennet as evidence that she, in fact, carried out that intent." Burton provided additional testimony about Bennet's intentions to spend more time with Helmedach and his familiarity with Helmedach and her boyfriend, the defendant.

After Burton and the jury were excused, the court stated: "The jury is gone and the attorneys, based on a previous discussion and ruling by the court, want to record a . . . ruling that is not presently on the record . . . . I have specific reference to that portion of [Burton's] testimony indicating that around seven o'clock, or whatever the time was, that the—that . . . *Bennet had called him to tell him that she was going to chill or spend some time with [Helmedach]*. On a prior occasion, [defense counsel] indicated that he was going to object to *that*. It was discussed and rather than interrupt the flow of the testimony, it was agreed that he could preserve that ruling by . . . putting it on the record at an appropriate time . . . ." (Emphasis added.) The court then allowed defense counsel to address his objection. Defense counsel stated: "Thank you, Your Honor. . . . [O]bviously, it is a hearsay statement, and the court did give a limiting instruction as to that, but also . . . because there's no mention of my client, who is the gentleman who's on trial for these charges, that it would . . . not be directly relevant to him. And furthermore, because it did not express . . . in any way, shape or form that [Bennet] was going to hang out with him. Further, and I think it's attenuated in that there's no conspiracy counts in the information, [Helmedach] is never named as coconspirator or anything else that . . . would imply . . . from . . . that [Bennet is] going to hang out with [Helmedach] that she was going to hang out . . . with my client in some fashion. So, because . . . there's no conspiracy count, so, I mean

there's no named coconspirators. In none of the information . . . is she specifically named, and she's not on trial here. It's my client who's on trial. So, under those circumstances, while it may have been admissible at and may be, if [Helmedach] is tried, to her case, I'm objecting to it on both the hearsay and then further on the relevance grounds, and it is more prejudicial than probative, I should add."

At no point did the defense attorney indicate that he did not agree with the court's characterization of his objection to the evidence or indicate in any way that the defendant objected to Burton's testimony regarding Bennet's statements about past events. The prosecutor responded that the challenged testimony was relevant because the state had alleged that the defendant acted with another participant and that "the fact that the victim indicated that she was going to hang out with [Helmedach] is probative because it certainly would place the victim at a location where . . . Helmedach could be found, as well as [the defendant]. So, I think it goes to the weight, not to the admissibility of it."

The court concluded that "the reasons stated by the [prosecutor] are adequate, and I endorse those as part of my . . . reasoning for allowing [the challenged testimony]. I would also note to you that clearly, that . . . evidence is a classic example of the admissibility of a declaration indicating a present intention to do a particular act in the immediate future. . . . The declarant told the witness that she was then going to go visit her girlfriend. I don't think there's any dispute that it was made in good faith and that there was no indication that it was made for any self-serving purpose . . . . This is someone who is going to visit a girlfriend. The natural thing would be to tell her boyfriend, whom she had left, and there's absolutely no indication that this was for any self-serving purpose. So, I think all those

criteria have been met. I have given a cautionary instruction that it can be used only as evidence of her intent to make that visit . . . . I do not think there is any requirement that . . . the defendant be the one that was involved in that statement or as the person she was going to visit. . . . It is relevant because it puts the declarant in a particular place at a particular time, and it's her placement in connection with all the other evidence that relates to that, which is significant or the controlling factor . . . at least in the felony murder count and in the robbery count . . . . [T]he probative value outweighs any potential prejudice, and for those reasons I did overrule your objection, and that is now on the record to protect your objection."

As a preliminary matter, we must determine whether the defendant preserved his claim for appellate review. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush. . . . *State* v. *Cabral*, 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005); id., 531 (declining to review claim that

tape-recorded statements were inadmissible under coconspirator hearsay exception when objection at trial was on different ground that listener was acting as agent of police when statements were made); see also Practice Book § 5-5. . . . *State* v. *Simpson,* 286 Conn. 634, 645–46, 945 A.2d 449 (2008); see also *Council* v. *Commissioner of Correction,* 286 Conn. 477, 498, 944 A.2d 340 (2008) ([A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party.).'' (Internal quotation marks omitted.) *State* v. *Johnson,* 289 Conn. 437, 460–61, 958 A.2d 713 (2008).

In the present case, the defendant failed to preserve the claim he now asserts. He properly preserved his claim that Burton should not be allowed to testify about Bennet's future intentions on September 2, 2004,[15] but failed to apprise the court of any objection to the admission of her statements about prior contact with Helmedach. The defendant argues that ''though it was the second half of [Burton's testimony] that predominated discussion at trial and on which the trial court instructed the jury, it defies common sense to presume that by the defendant's objection, the court was not placed on notice that the first half of Burton's answer . . . was also irrelevant hearsay.'' It is clear from the record, however, that neither the court nor the prosecutor were made aware that the defendant's objection extended to Burton's testimony in its entirety. Accordingly, we decline to review the defendant's first claim.

## II

Second, the defendant claims that the court abused its discretion when it allowed Pekrul to testify about the

[15] See footnote 14.

Amber Alert issued by the Meriden police department. Specifically, the defendant claims that Pekrul's testimony had minimal probative value, which was outweighed by its prejudicial impact. We agree but find the admission harmless.

On May 15, 2006, Pekrul testified, and the following exchange took place:

"[The Prosecutor]: Now, after those efforts were exhausted, checking those two ex-girlfriends, did you or other members of the Meriden police department cause to be issued an Amber Alert?

"[The Witness]: Yes, we did.

"[The Prosecutor]: Can you explain to the jury what that is?

"[Defense Counsel]: Objection, Your Honor, relevance to the—"

The court then excused the jury and asked the prosecutor what his line of questions concerned.[16] The prosecutor explained that Pekrul would testify that the Meriden police were looking for the defendant, Helmedach, her infant child and Bennet's Chevrolet Blazer. Additionally, Pekrul would explain what an Amber Alert is, how it is issued and how information is given to the public. The prosecutor argued that it was relevant because the defendant, in his taped statement, indicated that he was aware that his name was "plastered all over the state" and that he fled as a result.

The prosecutor argued that the publicity generated by the Amber Alert and the defendant's flight as a result was evidence of consciousness of guilt. The defendant argued that calling the publicity an "Amber Alert, then going into what this Amber Alert is all about . . . and

---

[16] The court also stated that the defendant's attorney could voir dire the witness if he chose to do so.

upping the ante . . . appeals to the emotions of the jury, and . . . lacks direct relevance."[17] The defendant's attorney suggested that the fact that "[the defendant's information] was publicized . . . is fair game, but . . . the characterization [as an Amber Alert] is where I believe that it crosses the border and seeks to put an emotion into this . . . case . . . ." The defendant agreed that the publicity was relevant but could be introduced without reference to the Amber Alert.

The court stated that the Amber Alert procedure is "basically a factual statement of what the police did to generate the notice that they were looking for the defendant. . . . [I]t certainly bears on subsequent staying away from the state if, in fact, that's what the evidence indicates, and in moving from place to place. I don't think it's prejudicial. . . . To the extent that you claim somehow it will generate prejudice in the eyes of the jury because they're looking for a child, I don't think that's persuasive. It's probative. . . . It's relevant to consciousness of guilt, which is certainly a material issue, and I don't think it generates the kind of prejudice that you are relying on. I think it's relevant . . . to a material issue. I think the . . . state's entitled to show just what was . . . in the public's eye to reflect on consciousness of guilt, and I'm going to allow it."

Pekrul testified before the jury that "[a]n Amber Alert is issued specifically for when we have an issue regarding a child where we've—we believe that there's a potential of a safety issue with the child and want to recover the child, find that child as quickly as possible,

[17] We note that the defendant's objection was only to the second question posed to Pekrul, in which Pekrul was asked to explain an Amber Alert, and not to the question regarding whether an Amber Alert was issued. Nor did the defendant make any motion to strike Pekrul's testimony that an Amber Alert had been issued. To the extent, therefore, that the defendant relies on the emotions evoked by the mere use of the phrase "Amber Alert," we decline to review his inadequately preserved claim.

and it's done through the state, and there are signs on the highways where they issue the vehicle description along with the plate and a description of the people involved, and hopefully we can find out where they—they are with the child at that point through that—that system." Pekrul then testified regarding the recovery of Bennet's Chevrolet Blazer and the child in East Orange, New Jersey.

The defendant claims that the court abused its discretion when it allowed Pekrul to testify about the Amber Alert issued by the Meriden police department. The defendant argues that the danger of unfair prejudice outweighed the probative value of the Amber Alert evidence and that its admission was harmful.

"The admissibility of evidence . . . is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Internal quotation marks omitted.) *State* v. *Akande*, 111 Conn. App. 596, 612, 960 A.2d 1045 (2008). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . A nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and

visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . .

"Relevant evidence is excluded, however, when its probative value is outweighed by the danger of unfair prejudice. . . . A determination regarding undue prejudice is a highly fact and context-specific inquiry. [T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court . . . and is subject to reversal only [when] an abuse of discretion is manifest or injustice appears to have been done. . . .

"To be unfairly prejudicial . . . [a] mere adverse effect on the party opposing admission of the evidence is insufficient. . . . Evidence is prejudicial when it tends to have some adverse effect [on] a defendant beyond tending to prove the fact or issue that justified its admission into evidence. . . . Trial courts must exercise their discretion cautiously in balancing the probative value of [the evidence] with any likelihood of undue prejudice to the defendant. . . . [I]n making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. . . .

"Thus, we have recognized that [t]here are [certain] situations [in which] the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jur[ors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the

main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. . . .

"Indeed [a]ll adverse evidence is [by definition] damaging to one's case, but [such evidence] is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . Such undue prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 562–64, 958 A.2d 1214 (2008).

The defendant claims that the admission of the testimony about the Meriden police department's issuance of an Amber Alert constituted an abuse of the court's discretion. The defendant argues that the admission was harmful because it gave the jury the impression that he kidnapped Helmedach and her child, undercutting the theory of defense that Helmedach was responsible for murdering and robbing Bennet and that he confessed to protect her. We conclude that the court abused its discretion by allowing Pekrul to explain what an Amber Alert is. In light of the properly admitted evidence in this case, however, we conclude that the error was harmless.

The state argues that Pekrul's testimony was "highly probative" of the defendant's consciousness of guilt and police investigation techniques. The challenged testimony, however, was not that publicity was generated or how the police generated it, but Pekrul's testimony that police believed there was a potential safety issue with Helmedach's child and that they wanted to find the child as quickly as possible. Such testimony could have "unduly arouse[d] the jur[ors'] emotions, hostility

or sympathy, [or] create[d] a side issue that . . . unduly distract[ed] the jury from the main issues . . . ." (Internal quotation marks omitted.) *State* v. *Allen*, supra, 289 Conn. 563. In addition, we can see no reason that fears over the child's safety were relevant to proving the defendant's guilt, other than the impermissible inference that the police thought the defendant was a dangerous man.[18] Finally, the defendant conceded at trial that evidence of the publicity was relevant and argued that testimony that did not refer to the Amber Alert or the child's safety could be admitted without objection. Thus, we conclude that Pekrul's challenged testimony, the "extraneous" evidence, posed a risk of undue prejudice. See id., 564.

The defendant, however, has failed to persuade us that the brief testimony that the police were concerned with the safety of Helmedach's child was ultimately harmful. The jury heard evidence that included (1) testimony about the discovery of Bennet's grievously injured body, (2) a videotape of the bloody crime scene, (3) a photograph of a baby bottle near Bennet's body, (4) testimony that infant formula was found near Bennet's body, (5) testimony that a second, infant, victim was searched for at 16 Mosher Street, (6) testimony that the defendant and Helmedach fled the scene with a crying infant in Bennet's stolen Chevrolet Blazer, (7) testimony that the defendant had left Helmedach's child with a relative to prevent harm to her during the defendant's arrest and (8) testimony that the child had been found without any injury. Additionally, the jury was presented with overwhelming, properly admitted evidence of the defendant's guilt, including the bloodstains

---

[18] The state argues that the jury was not required to leave common sense at the door, essentially arguing that the description of an Amber Alert was an easy way to explain police techniques to the jury. We note, however, that prejudicial evidence may not be characterized as more probative than prejudicial simply because it is shorthand for the jury.

on his clothing that were attributable to Bennet, and his confession that he murdered Bennet in a manner consistent with the medical examiner's findings. Thus, we are assured that the error did not substantially affect the verdict. See *State* v. *Snelgrove*, supra, 288 Conn. 758.

## III

Finally, the defendant claims that the court improperly instructed the jury regarding consciousness of guilt.[19] Specifically, the defendant claims that the court instructed the jurors that they had heard evidence that he fled from 16 Mosher Street and that the court deprived him of the right to have the jury decide whether his departure constituted flight and demonstrated consciousness of guilt. We disagree.

The court instructed the jury in relevant part: "When a person is on trial for a criminal offense, it is proper to show his conduct or statements subsequent to the alleged criminal offense, which may fairly have an influence by that act. As this rule applies to this case, the law recognizes that an accused's flight, which, if a jury can reasonably conclude was done in an attempt to avoid detection of a crime or responsibility for a crime, is admissible against the accused as evidence reflecting that he was conscious of his own guilt. In this regard, you heard evidence that the defendant fled from 16 Mosher Street out of Connecticut into New York where he was apprehended. Whatever you find proven in this regard as to flight, if anything, and that depends on your assessment of the credibility of such evidence,

---

[19] The defendant argues that although he did not object to the court's instruction, his claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). The state acknowledges, however, that the defendant objected to the charge because it "tends to highlight and muster evidence more favorable . . . to the state, and by doing so it is more prejudicial to the defendant than is warranted . . . ." Accordingly, we will review the defendant's claim because it was preserved properly at trial.

must have been influenced by the criminal act and not by any other reason consistent with innocence.

"Flight is one type of conduct which may prove consciousness of guilt. The flight of a person accused of a crime is a circumstance, which, when considered together with all of the facts in the case, may justify a finding of guilt. However, flight, if shown, raises no presumption of guilt and is not conclusive. First, you must determine whether the state has proven any such flight. If so, and if you then find proven that the defendant did so in connection with these crimes, this does not raise a presumption of guilt. It is circumstantial evidence that you may or may not infer consciousness of guilt from. It is to be given the weight, if any, to which you think it is entitled to under the circumstances. It is up to you, as judges of the facts, to decide whether the state has proven any such flight, and if so, whether or not whatever has been proven reflects a consciousness of guilt by the defendant in connection with these alleged crimes and to consider such in your deliberations in conformity with these instructions.

"Under the same rule and with the same limitations, statements of the defendant made after the alleged crime may show consciousness of guilt. In this regard, the state has offered evidence of statements made by the defendant at the time of his apprehension in New York. The state claims that such statements reflect the defendant's acknowledgement of his guilt. Again, whatever you find proven in regard to such statements, if anything, and that will depend on your assessment of the credibility of the evidence, must have been influenced by the criminal act and not by any other reason consistent with innocence. Even then such proven statement raises no presumption of guilt and is not conclusive. Again, first you must determine whether the state has proven any of such statements. If so, and if you then find proven that the defendant did so in

connection with these crimes, this does not raise a presumption of guilt. It is circumstantial evidence and you may or may not infer consciousness of guilt from it. It is to be given the weight, if any, to which you think it is entitled to under the circumstances. It is up to you, as judges of the facts, to decide whether the state has proven any of such statements, and if so, whether or not whatever has been proven reflects a consciousness of guilt by the defendant in connection with these alleged crimes and to consider such in your deliberations in conformity with these instructions."

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . .

"A jury charge in which the court removes from the jury's consideration an issue that is one of the essential elements of the crime, and thereby relieves the state of the burden of proving every element beyond a reasonable doubt is improper. . . . A proper instruction on flight as consciousness of guilt, however, merely identifies a permissive inference that the jury might draw from the defendant's conduct. . . . A consciousness of guilt instruction is, therefore, not so directly related to an essential element of the crime that an improper flight instruction raises constitutional implications. . . .

"If no constitutional issues are raised by the claim of an improper jury charge . . . we review the entire

charge to determine whether the instructions are correct in law and whether they presented the case to the jury so that no injustice would result. . . . [T]he charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Citations omitted; internal quotation marks omitted.) *State* v. *Crnkovic*, 68 Conn. App. 757, 767–68, 793 A.2d 1139, cert. denied, 260 Conn. 925, 797 A.2d 521 (2002).

It is well established that "[t]he decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Figueroa*, 257 Conn. 192, 196, 777 A.2d 587 (2001). "[F]light, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous. . . . Moreover, [t]he court [i]s not required to enumerate all the possible innocent explanations offered by the defendant." (Internal quotation marks omitted.) Id., 196–97.

The defendant challenges the following portion of the court's instruction: "In this regard, *you heard evidence that the defendant fled from 16 Mosher Street out of Connecticut into New York* where he was apprehended." (Emphasis added.) The defendant argues that

the court "improperly instructed the [jurors] on how they should decide a material issue in the case, specifically, that [his] departure from Mosher Street was a 'flight,' and thereby advanced the jury one step further in its determination that the defendant's conduct demonstrated his consciousness of guilt." The defendant, however, fails to consider this instruction in context, as the jury heard it. Immediately following the challenged sentence, the court added: "*Whatever you find proven* in this regard *as to flight, if anything, and that depends on your assessment of the credibility of such evidence,* must have been influenced by the criminal act and not by any other reason consistent with innocence." (Emphasis added.) The court repeatedly instructed the jurors that they must find that the state had proven flight before they could consider whether that flight was motivated by a consciousness of guilt of the alleged crimes. Thus, when read as a whole, the court's instruction properly informed the jurors that the defendant's consciousness of guilt was a permissive inference that they could draw from his conduct. See *State* v. *Crnkovic*, supra, 68 Conn. App. 767–68. Accordingly, we conclude that the court's instructions were in accordance with the law and that the court did not abuse its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.